**Jason Eric MASSEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 72025.**

Court of Criminal Appeals of Texas.

Oct. 23, 1996.

---

Michael W. Hartley, Waxahachie, for appellant.

Cynthia W. Hellstern, Asst. District Attorney, Waxahachie, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MALONEY, Judge.

Appellant was convicted of capital murder for the murders of two persons during the same criminal transaction. Tex. Penal Code Ann. § 19.03(a)(7)(A). The jury affirmatively answered the special issue submitted under Tex.Code Crim. Proc. Ann. art. 37.071 § 2(b)(1) and answered the mitigation special issue submitted under Tex.Code Crim. Proc. Ann. art. 37.071 § 2(e) in the negative. Appellant was sentenced to death. Tex.Code Crim. Proc. Ann. art. 37.071 § 2(g). Direct appeal to this Court is automatic. Tex.Code Crim. Proc. Ann. art 37.071 § 2(h). Appellant raises twenty-four points of error. We affirm.

In his first point of error, appellant claims the trial court erred in failing to suppress evidence seized pursuant to a search warrant issued without probable cause on the basis of material and intentional misrepresentations as to the credibility of the informants. Specifically, appellant complains that the affiant, Detective J. Cruz, misrepresented the reliability of two named informants, Mark Gentry and Christopher Nowlin, by omitting from the probable cause affidavit the facts that both had criminal histories and were possible suspects in the instant murders, and that Cruz had been unsuccessful in an attempt to corroborate one of Gentry's incriminating assertions about appellant.[1] Appellant argues that material omissions of fact should be treated like misrepresentations of material information under *Franks v.*

---

1. Gentry had told Cruz that appellant kept the heads of animals he had killed and mutilated in an ice-chest near his home. Cruz had looked for but been unable to locate the cooler at the time he obtained the search warrant.

*Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The probable cause affidavit is attached as an Appendix hereto.

In *Franks,* the United States Supreme Court recognized that if an affirmative misrepresentation is knowingly included in a probable cause affidavit and is material and necessary to establishing the probable cause, the warrant is rendered invalid under the Fourth Amendment.[2] While this Court has not recognized that a *Franks* analysis pertains to omissions as well as false statements, some federal courts have so held.[3] *See United States v. Martin,* 615 F.2d 318, 328 (5th Cir.1980)(recognizing that allegations of material omissions to be treated essentially like claims of material misstatements). We need not decide today whether we will also recognize application of a *Franks*-like analysis to intentional and material *omissions* of fact in the warrant affidavit because appellant has failed to establish that the omissions were made intentionally or with a reckless disregard for the accuracy of the affidavit.

*Franks* requires the defendant to make a showing that the false statement was made knowingly and intentionally, or with reckless disregard for the truth. *Martin,* supra, which applies a *Franks* analysis to intentional omissions of material facts, holds that the defendant has the burden of proving by a preponderance of the evidence that, first, that the omissions were in fact made, and second, that they were made intentionally or with a reckless disregard for the accuracy of the affidavit. If [the defendant] carried this burden, [the reviewing court] would be required to determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause. . . .

*Martin,* 615 F.2d at 328.

The record does not support appellant's contention that Cruz affirmatively misrepresented Nowlin's and Gentry's reliability by the omissions. The affidavit contains information pointing out that Nowlin and Gentry were not outstanding citizens. The affidavit states that a few days before the murder Gentry, Nowlin and appellant were unable to meet the victims in a pre-planned rendezvous because on the designated night Gentry had been stabbed and hospitalized and Nowlin was passed out drunk. While Cruz was open to the possibility that Nowlin and Gentry might have been involved in the offense, he had no concrete evidence supporting that possibility. Further, other evidence discussed in the affidavit corroborated Nowlin's and Gentry's statements as to appellant's involvement, bolstering their reliability.[4]

2. Specifically, *Franks* held as follows:

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

The trial court appears to have entertained appellant's *Franks* claim during the suppression hearing.

3. This Court has indicated that we might not recognize application of *Franks* to omissions of fact. In *Brooks v. State,* 642 S.W.2d 791 (Tex. Crim.App.1982), the defendant attacked the probable cause affidavit for its failure to disclose "that the confidential informant relied upon therein was paid by the police, had been convicted of criminal offenses, and had previously provided affiant with false information." We did not extend a *Franks* analysis to appellant's claims, but said:

Appellant's reliance on *Franks,* in this ground of error is misplaced. That case relates not to omissions of facts about an informant but only to false statements by the affiant which are made knowingly and intentionally or made in reckless disregard of the truth.

*Id.* at 796–97.

4. For instance, the affidavit states that a car generally matching the description of appellant's car honked at the victims' house on the night of the offense; other children at the house overheard the victims discussing a rendezvous. The affidavit states that earlier in the month when appellant was arrested on a charge of possession of marijuana, an inventory of his car revealed a number of items that could have been used as weapons in the instant murders. In addition, the affidavit states that the medical examiner indicat-

Given the corroboration of their statements and the consistency of their statements with the peculiar facts of the offense as outlined in the affidavit and other evidence gathered during the investigation and discussed in the affidavit, appellant has not shown that the omissions were made intentionally or in reckless disregard of the truth, in an attempt to mislead the magistrate. Appellant's first point of error is overruled.

■ In his second point of error appellant claims the trial court erred in failing to suppress evidence seized pursuant to a warrant that appellant claims was issued without probable cause on the basis of material and intentional misrepresentations contained in the probable cause affidavit. Our review of the record does not support appellant's assertions.

The affidavit states in part:

G.... [Appellant] also said [to Nowlin] that he wanted to cut [the female victim's] "pussy lips" [*labia majora*] off and fry them and then eat them....

H .... the body of [the female victim] had been decapitated and otherwise mutilated, with severing of hands and slashing of the body and in particular, cutting of the labial area of her body.

Appellant complains that the affiant, Detective J. Cruz, made a material misrepresentation in Section H because the medical examiner who had spoken with Cruz testified at trial that "... the labia itself and vagina show no injuries." Appellant claims this misrepresentation was an intentional effort to make the facts fit the allegations in Section G. We disagree. The medical examiner agreed that the cuts were "fairly close to" and were "almost touching" the labial region. The medical examiner further testified that there was a cut "just to the side of or lateral to the right labia majora" and that there were "cuts on the front of the pubic area ... at the base of the abdomen down in the pubic hair region." Further,

ed that fibers on the foot of one of the victims matched the type of fibers found in the carpeting

Q. ... would you say that those cuts were in the labia area or in the area of the labia?
[Medical examiner] A. They're very close. Some are.

While perhaps not technically precise, the statement that there were cuts to "the labial *area* of the body," (emphasis added), does not amount to a misrepresentation when compared with the facts.

■ The affidavit further states in part:
D. [Appellant] is the owner of a 1982 four-door Subaru vehicle ...
G.... Chris Keith Nowlin told me that ... he ... had been with [appellant] in a tan or beige four door Subaru car ...
H.... James King, the father of [the male victim] and the live-in boyfriend of the mother of [the female victim], has indicated to this officer that he saw a vehicle generally matching the description of the beige Subaru....

Appellant claims Section H contains a material misrepresentation because King testified he told Cruz he saw a light-colored Ford the night of the offense. He claims this is an intentional misrepresentation in an effort to render King's statement consistent with what Cruz knew to be appellant's car. This is not a material misrepresentation. The statement that King "indicated that he saw a vehicle generally matching the description of the beige Subaru" is not necessarily inconsistent with the statement that he saw a "light-colored Ford." A "light-colored Ford" might very well look generally like a beige Subaru. Appellant's second point of error is overruled.

■ In his third point of error appellant claims the search warrant was invalid because the probable cause affidavit was based on " 'mere conclusory statements' and suspicion of the affiant." Appellant points to three statements in the affidavit which he contends were conclusory. Appellant's claim is without merit. Even if a couple of the statements contained in the affidavit could be construed as conclusory, the affidavit as a

of appellant's car.

whole was sufficiently based upon assertions of fact from identified sources to support the search warrant. *See Spencer v. State*, 672 S.W.2d 451, 454 (Tex.Crim.App.1984)(invalid portions of affidavit to be excised and remaining content examined for probable cause). Appellant does not allege otherwise. Appellant's third point of error is overruled.

■ In point of error four appellant alleges the "trial court erred in failing to suppress the evidence introduced at trial which was seized as a result of a general search pursuant to a search warrant which was insufficient in its description of the items subject to the search and seizure." Appellant claims the description of items to be seized was not specific enough to prevent a general search for evidence, pointing to one paragraph of the probable cause affidavit as "one of the best examples" of the lack of specificity. He does not explain how any other portions of the warrant were too general.

■ We have held that unconstitutionally defective portions of a search warrant do not necessarily invalidate the entire warrant or taint all of the evidence seized pursuant to the warrant. *Walthall v. State*, 594 S.W.2d 74, 79 (Tex.Crim.App.1980); *see also Spencer*, supra. If only certain portions of a search warrant are invalid, only the evidence gathered pursuant to the offending portions is tainted. *Walthall*, 594 S.W.2d at 79.

Appellant complains of the trial court's failure to suppress evidence pursuant to the alleged general warrant, but does not point to specific evidence seized pursuant to the complained of paragraph and offered into evidence. In *Walthall*, we recognized that generally only evidence seized pursuant to offending portions of a warrant need be suppressed. *Id.* at 80 (recognizing that admission of evidence seized pursuant to proper portions of warrant was not error, while admission of evidence seized pursuant to invalid portions was error). It follows that when complaining of invalid portions of a search warrant, the defendant must identify the evidence seized pursuant to the allegedly invalid portions of the warrant. In failing to identify evidence that was seized pursuant to the complained of portion of the affidavit, appellant has inadequately briefed this issue and

therefore failed to preserve his claim for review. Appellant's fourth point of error is overruled.

In his fifth point of error appellant claims the search warrant "is void of any information that would create a reasonable belief that items of contraband or evidence would be found in appellant's home" or in his car. Appellant further complains of the officer's statement at the pretrial hearing that he "believed that it was possible that" the items would be found in appellant's residence or car. He contends that "a belief there is a possibility" is not an appropriate standard.

■ An affidavit must allege substantial facts establishing probable cause to believe that the items would be found at the identified place. *See Johnson v. State*, 722 S.W.2d 417, 422 (Tex.Crim.App.1986)(opinion on reh'g). The question is whether

> ... the facts submitted to the magistrate are sufficient to justify a conclusion that the property that is the object of the search probably is on the ... premises to be searched at the time the warrant issues.

*Hass v. State*, 790 S.W.2d 609, 612 (Tex.Crim.App.1990)(quoting *Gish v. State*, 606 S.W.2d 883, 886 (Tex.Crim.App.1980)). Further, we look at the four corners of the affidavit in determining the existence of probable cause to search the identified locations. *Doescher v. State*, 578 S.W.2d 385, 387 (Tex.Crim.App.1978). Statements made during the pretrial hearing do not factor into that determination. Therefore, Cruz's statements during the pretrial hearing as to "possibility" rather than "probability" do not bear upon our assessment of probable cause.

■ We hold the affidavit alleges facts "sufficient to justify a conclusion that the property that is the object of the search probably" was in appellant's residence or car. *Hass*, supra. As to appellant's vehicle the affidavit states that appellant owns and is known to drive a Subaru, that appellant had previously made plans with the victims to meet them in his car, that others had been with appellant in a "tan or beige four door Subaru car," that appellant had been seen carrying a dead cat in his car, that Brian King had heard a horn honk and seen a

vehicle matching the general description of appellant's vehicle at the victims' residence on the night of the offense, that various weapons that could have been used in the murders had been found in an inventory search of the tan Subaru owned and driven by appellant within weeks of the instant offense,[5] that the medical examiner reported fibers found on one of the victims "match[ed] the kind of fibers found in floormats of Japanese type vehicles and that the fiber was brown in color," that appellant's car "has dark brown interior carpeting and is a Japanese make of car." As to appellant's residence, the affidavit alleged that Gentry had known appellant "to cut off the heads of cats and dogs calling them his 'trophies' and store them in a red rusty metal cooler in the woods near his home," that appellant told Nowlin he wanted to "cut the [female victim's] pussy lips [*labia majora*] off and fry them and then eat them." The affidavit further alleged that the female victim "was found to have been ... decapitated ... her hands cut off, sexually mutilated and disemboweled," and there was "cutting in the labial area of her body." These factual allegations were sufficient to justify a conclusion that evidence of the offense probably was in appellant's car and/or residence. Point of error five is overruled.

█ In his sixth point of error appellant alleges the "trial court erred in failing to suppress appellant's personal writings that were seized as a result of a search pursuant to an unlawful search warrant which expressly permitted the search for and seizure of personal writings of the appellant." However, appellant fails to point to any personal writings seized pursuant to the warrant that were admitted at trial.[6] Appellant has failed to support his allegations and therefore inadequately briefed this point of error. Point of error six is overruled.

█ Appellant's seventh point alleges the trial court erred in overruling his motion to suppress evidence obtained by the State through abuse of the Grand Jury subpoena process. Appellant claims the subpoena of his medical records, which contained a journal written by appellant, from Parkland Hospital in Dallas County through the Ellis County Grand Jury, violates the proscription of the seizure of personal writings in Tex. Code Crim. Proc. Ann. art. 18.02(10).

The day before testimony began in the punishment phase of trial, four journals written by appellant were discovered.[7] One of those journals was the same journal that was copied into appellant's medical records and obtained pursuant to the Grand Jury subpoena of which appellant complains. The journals were admitted into evidence without objection. Excerpts from the journals were read to the jury during punishment without objection and the journals were relied upon by the State's experts in making their assessments about appellant's future dangerousness.

█ If a defendant objects to the admission of evidence but the same evidence is subsequently introduced from another source without objection, the defendant waives his earlier objection. *Hughes v. State,* 878 S.W.2d 142, 155 (Tex.Crim.App.1992)(opinion on reh'g), *cert. denied,* —— U.S. ——, 114 S.Ct. 2184, 128 L.Ed.2d 902 (1994); *Stoker v. State,* 788 S.W.2d 1, 12 (Tex.Crim.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). Therefore, any error that might have occurred in the subpoena or admission of the writings contained within the medical records was waived when appellant failed to object to the subsequent admission of the same evidence. Appellant's seventh point of error is overruled.

---

5. The affidavit alleged that in the same month as, but previous to, the instant offense, appellant was stopped and arrested for possession of marijuana. The following items were discovered in an inventory search of appellant's tan Subaru at that time:

 a three bladed axe, another more common axe, a hatchet, a large knife, [and] a claw hammer....

6. The State asserts in its brief that "None of the personal writings of appellant that were seized under the search warrant was admitted at trial." Appellant has not disputed this statement in a reply brief.

7. A man testified that he was deer hunting in the woods and came upon a cooler containing skulls and four journals written by appellant.

In his eighth point of error, appellant claims the trial court erred in overruling his challenges for cause to veniremembers Edwin Paul Eddleman and Delores Gibbs Slagle. Appellant alleges these veniremembers were challengeable for cause because they would not consider certain evidence as mitigating, specifically age.

We have repeatedly held that only the individual juror can decide what mitigating weight, if any, is to be given to particular evidence. *See, e.g., Curry v. State,* 910 S.W.2d 490, 494 (Tex.Crim.App.1995). A venireman is not challengeable for cause on the ground that he will not give mitigating effect to particular evidence. *Morrow v. State,* 910 S.W.2d 471, 473 (Tex.Crim.App.1995). Eddelman and Slagle were not challengeable for cause on the ground that they would not agree to consider certain evidence, including age, as mitigating. Point of error eight is overruled.

In point of error nine appellant claims the trial court erred in failing to sustain his challenges for cause against veniremembers Johnny Ray Christopher and Eddie Don Land on the ground that they were biased against the law upon which appellant was entitled to rely. Tex.Code Crim. Proc. 35.16(c)(2).

Appellant complains that Christopher testified he would follow his personal opinions rather than the law. Appellant complains that Land was properly challengeable for cause because he stated he had formed an opinion about the guilt or innocence of appellant and stated that he believed he could not be fair.

While Christopher initially indicated some equivocation on whether he could put his personal views aside when responding to questions from appellant, when it was explained to Christopher that he would be instructed by the trial court to put his personal views aside and follow the law, Christopher testified that he would be able to do that. Land stated that although he had become aware of appellant's case via newspapers and

television, and might have formed an opinion about the case at one time,[8] he would be able to set any opinion aside, listen to the evidence and follow the court's instructions. The trial court did not abuse its discretion in overruling appellant's challenges for cause to Christopher and Land. Point of error nine is overruled.

In his tenth point of error, appellant claims the trial court erred in granting the State's challenge for cause to veniremember Michael Dwayne Westbrook, as contrary to *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Appellant argues that although Westbrook indicated opposition to the death penalty, he unequivocally stated he could follow the law despite his personal views. The State claims Westbrook was an equivocating juror who made numerous contradictory statements, and therefore we should defer to the trial court.

We recently emphasized that "when the venireperson vacillates or equivocates on their ability to follow the law, the reviewing court must defer to the trial court's judgment." *Brown v. State,* 913 S.W.2d 577 (Tex. Crim.App.1996).

Review of the record supports the State's characterization of Westbrook. Westbrook's answers as to whether he would be able to put his views on the death penalty aside, listen to the evidence and answer the special issues as proven by the evidence, varied depending upon who was asking the question. Sustaining the State's challenge, the trial court stated,

> The Court finds the juror potential juror [sic] is easily confused, contradictory, vacillating and equivocating, basically answers whichever way depending on which attorney asks the questions. The juror answers that way depending on who is talking to him last. Apparently, to the best the Court observed, doesn't understand the process. Further finds that based on the Court's observation of the witness, and

8. It was unclear as to whether Land's opinion pertained to appellant's guilt. At one point he seemed to indicate that it did, but later he stated

that he had not formed an opinion as to appellant's guilt, but just knew that the authorities had arrested appellant.

the way he answered the questions, most of them, which answers are very difficult to understand, finds that the juror's ability would substantially prevent or impair the performance of his duties as a juror in accordance with his instructions.

The record supports the trial court's ruling. In the case of an equivocating veniremember, we defer to the trial court. *Brown,* supra. Point of error ten is overruled.

 In point of error eleven appellant contends the trial court erred in overruling his *Batson* challenge to the State's use of a peremptory strike against veniremember Brenda Gray.[9] *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Appellant complains of a "lack of questioning ... disparate treatment, ... disparate examination of members of the venire or an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically."

According to the record, Gray was the single African-American peremptorily struck by the State. The State furnished five race-neutral explanations for its strike:

1. Gray was the only veniremember to answer "none of the above" (choice "6") in response to a jury questionnaire question asking which attitude best represented the feeling of the veniremember about the death penalty.
2. Gray had been arrested for shoplifting in New Orleans and when asked about the incident she gave an internally contradictory account of the incident.
3. Gray had a nephew who had been arrested for theft.
4. Gray had consistently answered the State's voir dire questions about the death penalty in an equivocal manner.
5. Gray betrayed antagonism toward the State.

Overruling appellant's *Batson* challenge, the trial court noted it had perceived no difference between the State's examination of Gray and the rest of the veniremembers. The trial court also observed that the State had consistently rejected any veniremember who answered anything but "1" or "2" to the

question regarding the veniremember's views on the death penalty. The trial court also found the State's race-neutral explanations were supported by the record and its own perceptions of the voir dire.

We have reviewed the record and conclude the trial court's findings are supported thereby and are not clearly erroneous. Appellant's eleventh point of error is overruled.

 In point of error twelve, appellant argues the trial court erred in denying his motion to videotape the jury selection proceedings. Appellant argues the court's ruling denied him a fair and impartial trial and meaningful appellate review because the written record does not adequately reveal the "intimidating atmosphere" in which veniremembers Westbrook and Gray were examined by the State.

A trial court does not abuse its discretion in refusing to allow videotaping of voir dire proceedings. *Curry,* 910 S.W.2d at 492. Appellant has not demonstrated that he was prevented from attempting to create a record, by other means, of the allegedly hostile atmosphere. Appellant's twelfth point of error is overruled.

 In point of error thirteen, appellant claims the trial court erred in denying his motion for appointment of an expert to assist him in examination of the State's DNA evidence. In point of error fourteen, appellant claims the trial court erred in denying his request for funds to pay for additional DNA testing.

Appellant initially moved for independent examination of certain evidence, including DNA analysis. His motion was granted, and the trial court ordered payment of expenses "for the purposes of preparing and presenting expert witnesses ... Genelex Corporation." Later, appellant filed a second motion for an independent expert to "testify about problems in the application of PCR testing technique." Appellant alleged that while Genelex was competent to test the evidence using the same technique as the State, it was not able to assist the defense in challenging

9. The record also refers to this veniremember as Brenda Jerry.

that technique. He sought appointment of "a population geneticist, microbiologist and clinical laboratory which has analyzed the reliability of the technique of PCR DNA testing and population data basing." Appellant sought appointment of Dr. John Gerdes. Appellant also sought additional funds for further DNA testing by Genelex.

The record reveals that the trial court initially refused to appoint Gerdes, but granted appellant's request for additional funds for purposes of further testing. The next day appellant moved for permission to use the additional funds for Gerdes instead of for the additional DNA testing. The trial court permitted the substitution and appointed Gerdes. Appellant does not allege or show that he objected to the loss of additional testing in exchange for retaining Gerdes.

Because Gerdes was appointed as appellant requested, point of error thirteen is overruled. Because appellant failed to object to the trial court's re-allocation of the retesting funds, point of error fourteen is overruled.

In point of error fifteen, appellant claims the trial court erred in admitting DNA evidence because the State failed to prove it was reliable and therefore relevant.

Under Rule of Criminal Evidence 702, the trial court's task is to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. *Kelly v. State,* 824 S.W.2d 568 (Tex. Crim.App.1992); *Jordan v. State,* 928 S.W.2d 550 (Tex.Crim.App.1996). The proponent of scientific evidence proves its reliability by showing (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory; and (3) proper application of the technique on the occasion in question. *Kelly,* 824 S.W.2d at 573. We emphasized that these three criteria must be proven to the trial court outside the presence of the jury before the evidence in question is admissible. *Id.* The "overarching" concern under Rule 702 is the scientific validity of the evidence; its reliability depends upon whether it is rooted in sound scientific methodology. *Jordan,* at 554–55. The trial court is the sole judge of the weight and credibility of the evidence presented at a suppression hearing pertaining to admissibility of scientific evidence, and we review the evidence in the light most favorable to the trial court's ruling. *Id.* at 574.

Appellant complains the State failed to meet its burden on the second and third of the above listed three criteria. As to the validity of the technique applying the theory, he argues that the State did not prove that "subjective interpretation of results demonstrating contamination ... is an acceptable part of the technique applying the scientific theory involved." As to proper application, he contends that the specimens tested contained too little DNA and were possibly contaminated with another person's DNA, leading to unreliable results.

Michael DeGuglielmo, director of the company that conducted the DNA tests for the State, testified at length about the testing procedures employed, as well as the quality and security controls in place. At issue was whether the tests reflected a contaminant that rendered the results unreliable. DeGuglielmo acknowledged that an "allele" appeared on the results pertaining to one of the victims that could not have belonged to the victim, but explained that its presence did not mean that the other alleles present could not be interpreted as belonging to the victim, particularly in light of the results obtained from testing of the victim's parents. DeGuglielmo also stated that there was sufficient DNA to accurately run the tests. Dr. Phillip Hartman, a professor of biology at Texas Christian University, concurred in DeGuglielmo's opinion about the test results. Dr. John Charles Gerdes, appellant's expert, testified that in his opinion the type of testing conducted by the State was not appropriate for forensics because of the possibility of contamination and expressed his opinion that the results were unreliable. DeGuglielmo and Hartman disputed Gerdes' opinion.

Viewing the evidence in a light favorable to the trial court's ruling, we hold the trial court did not abuse its discretion in overruling appellant's objections to the admission of the State's DNA evidence on grounds of unreliability of the particular testing. The State's experts were qualified in the field, and de-

scribed and compared the various DNA testing techniques in detail and with clarity. While challenged by appellant's expert, the State's experts met each challenge with reasonable and coherent explanations as to why the test utilized and the results in the instant case should be viewed as reliable. Appellant's fifteenth point of error is overruled.

■ In point of error sixteen, appellant claims the limited right under Tex.Code Crim. Proc. Ann. art. 39.14 to inspect certain evidence in the State's case deprived him of his Sixth Amendment right to effective assistance of counsel. Appellant contends he was denied access to evidence pertaining to quality control and security measures employed at the laboratory utilized by the State for DNA testing and to evidence pertaining to standards applicable to the laboratory's personnel.

■ Article 39.14 governs discovery of evidence in criminal cases. The defendant bears the burden thereunder to show "good cause" for inspection of the sought after evidence. *See McBride v. State*, 838 S.W.2d 248, 250 (Tex.Crim.App.1992). The trial court must allow discovery of evidence that is shown to be material to the defense of the accused. *Id.* A defendant "has a right to inspect evidence indispensable to the State's case because that evidence is necessarily material to the defense of the accused." *Id.* at 251.

Appellant does not allege in his brief how the evidence was "material to the defense" or "indispensable to the State's case." Further, appellant does not allege how counsel was ineffective without the evidence he sought or how he was prejudiced by not being able to review the evidence. Accordingly, appellant has not met his burden and has failed to properly brief this issue. Point of error sixteen is overruled.

■ In point of error seventeen, appellant claims the trial court erred in admitting testimony of Jeff Estein and Ben Vyers, in violation of Tex.R.Crim. Evid. 404(b). In point of error eighteen, appellant complains of Estein's and Vyers' testimony under Rules 401 and 402, and in point nineteen, he complains of their testimony under Rule 403.

Estein testified in part as follows:

Q. [Prosecutor] What would [appellant] say about women that you thought was bizarre?

A. [Estein] Just that he would like to kill a girl.

 \* \* \* \* \* \*

Q .... would he tell you us [sic] what, in addition to wanting to kill them, he would say?

A. Just said he would like first to have sex with them, or kill them first and then have sex with them. How he would kill them was by cutting off their head and their hands.

Q. Would you sometimes say—when you're riding around, ever saw an attractive girl and would you sometimes [sic] you'd like to go out with that girl?

A. Yes, sir.

Q. What would [appellant] say sometimes in response to your saying that?

A. That he'd like to kill them.

Q. Did he ever say anything to you about having sex with the girl after he had killed her and cut off her head?

A. Yes, sir.

Q. Where would he want to have sex with that girl?

A. Where her head used to be.

Vyers testified in part as follows:

Q. [Prosecutor] Can you tell the jury what kind of statements about women [appellant] would make that you thought were unusual?

A. [Vyers] He would just in the middle of everything, you know, we'd be sitting there and he would say something about raping a girl and cutting her head off.

Appellant complains of the admission of this testimony.

In *Moreno v. State*, 858 S.W.2d 453 (Tex. Crim.App.), *cert. denied*, 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993), the defendant argued Rule 404(b) was violated by admission of testimony that, prior to the kidnapping and murder of the victim, he had

told several people that he planned to kidnap and kill another individual. We rejected the defendant's contention that Rule 404(b) required exclusion of that testimony:

> ... the statements concerning [the defendant's] thoughts ... were just that, inchoate thoughts. There is no conduct involved which alone or in combination with these thoughts could constitute a bad act or wrong, much less a crime. Absent this, [the defendant's] statements concerning his desire to kidnap and kill [the other individual] did not establish prior misconduct and thus were not expressly excludable under Rule 404(b), supra.

*Id.* at 463. The complained of testimony pertained to appellant's thoughts, not conduct. Rule 404(b) is not implicated. *Id.* Point of error seventeen is overruled.

 Appellant also objected to Estein's and Vyers' testimony as "irrelevant." Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R.Crim. Evid. 401. The trial court's Rule 401 rulings will not be reversed absent an abuse of discretion. *Moreno,* 858 S.W.2d at 463. Appellant's statements to Estein and Vyers reflect a desire to rape, kill and mutilate women in a very specific manner. One of the victims in this case was killed and mutilated in the same bizarre way as appellant had stated he would like to commit such offense. Appellant's stated desire to carry out an offense remarkably like the instant offense tends to prove identity, motive, and intent. *Id.* The trial court did not abuse its discretion in concluding that the testimony was relevant. Appellant's eighteenth point of error is overruled.

 In point of error nineteen appellant claims Estein's and Vyer's testimony was inadmissible under Rule 403 because it was more prejudicial than probative. Appellant points out that appellant had not mentioned a specific victim's name in connection with his expressed fantasies and that the testimony was not needed in light of Nowlin's testimony.

Rule 403 "favors admission of relevant evidence and implies a presumption that relevant evidence will be more probative than prejudicial." *Brimage v. State,* 918 S.W.2d 466, 505 (Tex.Crim.App.1994)(op. on reh'g). We will not reverse a trial court absent an abuse of discretion.

Vyers' and Estein's testimony was highly probative of appellant's motive and identity. Appellant's expressions of his desire to commit a crime in the same unique manner that it was ultimately committed linked appellant to the crime. Further, Vyers' and Estein's testimony contributed credibility to Nowlin's testimony. Nowlin testified that appellant had stated to him that he wanted to kill the female victim. Nowlin also testified that he had not taken appellant's statements seriously because appellant "always talked about killing girls." Estein's and Vyers' testimony corroborated that appellant had frequently talked about killing women, thereby rendering Nowlin's testimony more believable.

As to the prejudicial effect of the testimony, appellant argues it is cumulative of Nowlin's testimony and not sufficiently related to the facts of the case. The testimony was not "cumulative" because each of the witnesses did not testify to the same event. Rather, Nowlin, Vyers and Estein each testified to conversations that they had with appellant on separate occasions. The fact that the conversations involved a similar topic of discussion does not render them cumulative of one another. Further, the fact that appellant did not mention a victim's name in his conversations with Vyers and Estein does not render them, as appellant claims, as "having nothing to do with the victim in this case." Appellant expressed a desire to three of his friends to kill and mutilate a female victim in exactly the manner as the instant offense was committed against the female victim. The failure to specifically name a victim does not render appellant's as "having nothing to do" with this case. The trial court did not abuse its discretion in overruling appellant's 403 objection. Appellant's nineteenth point of error is overruled.

 In point of error twenty appellant claims the trial court erred in denying his request for a jury charge on the lesser in-

cluded offense of murder. Appellant argues the evidence did not conclusively establish that the two victims were killed in the same criminal transaction.

The evidence established that the victims were together when last seen alive, that their bodies were found together, that both victims died in the late evening or early morning hours of the same day, and that both had been shot with a .22 caliber weapon. Appellant contends the evidence was inconclusive as to whether the victims died in the same criminal transaction because Dr. Neal Haskell, the State's forensic entomologist, testified that he could not rule out the possibility that "the victims ended up at the locations they were found at different times" and Larry Fletcher, the State's ballistics expert, testified that after examining bullet fragments from both bodies, he could not make a conclusive determination that the fragments were fired from the same firearm.

■ A defendant is entitled to a charge on a lesser included offense if there is some evidence in the record which would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Aguilar v. State,* 682 S.W.2d 556, 558 (Tex.Crim. App.1985). In this case, appellant was entitled to an instruction on the lesser included offense of murder if there was some evidence that the two victims were killed only in separate transactions.

In cross-examining Haskell, appellant attempted to solicit testimony that the body of the male victim could have been deposited at the site later than the body of the female victim, based upon the amount and type of larvae infestation found on the bodies. Haskell maintained that the bodies were not deposited at the site at different times and that differences in the larvae were accounted for by the varying amounts of trauma to the bodies and accessibility thereto. While at one point, appellant solicited from Haskell the statement that there was "a possibility" that the bodies were deposited at the location at different times, Haskell later clarified that such answer was not based upon any interpretation of the evidence, but just on the fact that he could never be 100 percent certain of anything.[10] On redirect, Haskell reiterated that based upon his interpretation of the evidence, it was his opinion that the bodies were at the site for the same time period.

That a witness agrees that anything is possible and that he cannot be 100 percent certain of anything does not raise *evidence* for purposes of a lesser included offense. Haskell never agreed or testified that the evidence could be interpreted in such a way as to support appellant's suggestion that the bodies were deposited at the site at different times. His testimony does not amount to some evidence that the victims were killed in a separate transaction.

As to the firearms issue, even if it were shown that the bullets found in the two victims were fired from different guns, that would not establish that the victims were killed only in separate criminal transactions, and not in a single transaction. As stated above, in order to warrant a charge on a lesser included offense, the evidence must be such that a jury could find that the defendant was guilty only of the lesser offense. That two guns might have been used does not eliminate the possibility of a single transaction. One victim might have been shot first,

10. The following exchange occurred between defense counsel and Haskell:

> Q. [defense counsel] Doctor, could it be equally as consistent with the facts that the body of [the male victim] was deposited later and the flies colonized to lay their eggs later and not at the same time as [the female victim]?
> A. [Haskell] No, I don't think so.
> Q. But you don't know that?
> A. No, I don't know that.
> Q. And I'm just asking you, ... is it consistent with the fact that that body [of the male victim] might have been deposited at the site

> later and the colonization by the flies could have been later?
> A. That's a possibility.
> * * *
> Q. [defense counsel] All right. Now, let me go back, Doctor. Based on this, there is a possibility that the body of [the male victim] was deposited later than that of [the female victim] *on the basis of the development or are you saying that there's no possibility that you'd be 100 percent certain?*
> A. [Haskell] Oh, I can't be 100 percent certain on anything.
> (emphasis added).

and a few minutes later the second victim might have been shot with a different gun, for any number of reasons.

The evidence pointed to by appellant is not such as would cause a jury rationally to conclude that the two victims were killed only in separate transactions. Accordingly, the trial court did not err in refusing to charge the jury on the lesser included offense of murder. Point of error twenty is overruled.

■■■ In point of error twenty-one appellant claims the trial court erred in refusing his requested jury instruction regarding mitigating evidence, and that the instruction submitted failed to provide the jury a method to give effect to mitigating evidence.[11] In point of error twenty-two appellant alleges the jury instruction given at punishment did not permit the jury to express its "moral reasoned response" to the mitigating evidence presented.

In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court held that the former version of article 37.071 was unconstitutional as applied because it failed to provide the jury a vehicle with which it could give effect to mitigating evidence. Consideration of mitigating evidence and the opportunity to decline to impose the death penalty based thereon allows the jury to give a "reasoned response" in rendering its verdict. *Id.* at 319, 328, 109 S.Ct. at 2947, 2951–52.

The Texas Legislature subsequently amended article 37.071 in order to comply with *Penry*. The new statute has been upheld under the 8th Amendment as complying with *Penry*'s requirement that the jury be provided a means to consider and give effect to mitigating evidence at punishment in a capital case. *McFarland v. State*, 928 S.W.2d 482, 521 (Tex.Crim.App.1996)(reh'g denied).

The trial court in this case instructed the jury in accordance with the new statute.[12] Tex.Code Crim. Proc. Ann. art. 37.071 §§ 2(e), 2(f)(4). Appellant requested the following instruction:

> You are instructed that the term "mitigating evidence," as used in this herein [sic], means evidence of the defendants [sic] background, his character, and of the crime of which he was convicted, that a juror might regard as reducing the defendants [sic] moral blameworthiness for that crime, and that a juror believes, in fairness and mercy, call for a sentence less than death.

Appellant does not explain how his requested instruction provided a means for considering and giving effect to mitigating evidence that was not otherwise provided by the instruction given. The instruction given provided the jury a means to consider and give effect to mitigating evidence, and to express a "reasoned moral response" thereto. *See McFarland*, supra. Points of error twenty-one and twenty-two are overruled.

■■■ In point of error twenty-three appellant claims the trial court erred in permitting Dr. Clay Griffith to testify as an expert witness on the issue of appellant's future

---

11. Appellant alleges that the failure of the instruction to provide the jury a method to give effect to mitigating evidence violated the 8th and 14th amendments to the United States Constitution and Article I, section 10 of the Texas Constitution. However, appellant does not explain in what respect any of these constitutional provisions were violated, except to state that "[w]ithout guidance in the charge [the] evidence [of appellant's abusive childhood] loses its mitigating possibility and denies appellant due process" and to assert that because the jury had no way to express a moral reasoned response to the mitigating evidence, the instruction was "unconstitutional as applied in this case." These arguments are insufficient for us to specifically address the constitutional provisions referred to. Appellant makes no argument as to the state constitution.

12. The jury was instructed that if it answered the first special issue in the affirmative, it must answer the following issue:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find, or have a reasonable doubt thereof, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than death be imposed?

The jury was further instructed that they "need not agree on what particular evidence supports an affirmative finding" on this issue and that the term "mitigating evidence" "means evidence that a juror might regard as reducing the defendant's moral blameworthiness."

dangerousness on the ground that Griffith had no technical or scientific support for his opinion.

We recently addressed a nearly identical claim with respect to the admissibility of Dr. Griffith's testimony in another capital murder case, *Clark v. State*, 881 S.W.2d 682, 697–98 (Tex.Crim.App.1994). There, the defendant complained that Griffith did not have adequate specialized knowledge to predict future dangerousness. We reaffirmed that psychiatric testimony is admissible at the punishment phase of a capital murder case under Rule of Criminal Evidence 702, and that

> [t]he special knowledge which qualifies a witness to give an expert opinion may be derived from the study of technical works, specialized education, practical experience, or a combination thereof. . . .

*Id.* at 698. We concluded that Griffith was qualified as an expert:

> The record reflects Dr. Griffith's educational background, including the subspecialty of forensic psychiatry, teaching experience, and long-term private practice. This included examining over 8,000 people charged with criminal offenses and testifying in approximately 97 capital murder trials in Texas and other states. In light of such background, we hold that the rec-

ord does not reveal any abuse of discretion in allowing the expert testimony.

*Id.*

The record in this case similarly reflects Griffith's educational background and experience. Griffith testified to his various degrees and postgraduate training; he stated he had maintained a private practice in the field of psychiatry for 33 years, including 25 years in the forensic field; he testified that he was currently on the Board of Directors of the American College of Forensic Psychiatry; he stated he had testified in about 2,500 cases, including 146 capital murder cases. We hold the trial court did not abuse its discretion in allowing Griffith to testify as an expert. Point of error twenty-three is overruled.

▬ In point of error twenty-four appellant claims there is no evidence in the record of "technical or scientific support" for Griffith's testimony on the issue of appellant's future dangerousness. Appellant argues that Griffith's testimony was not reliable because he did not cite any studies or data in support thereof. Appellant's complaint on appeal does not comport with his objection at trial.[13] Therefore, appellant has not preserved any issue for review. Appellant's twenty-fourth point of error is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the judgment of the Court.

---

13. As trial appellant objected to Griffith's testimony as not having a valid scientific basis because he did not "use[ ] the authoritative manu-

als that [another State's psychiatrist] pointed out for the basis of [the other psychiatrist's] testimony[.]"

# APPENDIX I

## AFFIDAVIT FOR SEARCH WARRANT

| | |
|---|---|
| THE STATE OF TEXAS | S |
| COUNTY OF ELLIS | S |

The undersigned Affiant, being a peace officer under the laws of Texas, and being duly sworn, on oath makes the following statement:

1. That my name is JOHNNY CRUZ, and I am a peace officer serving as an Investigator in and for Ellis County Sheriff's Department, Waxahachie, Ellis County, Texas. I have been involved in law enforcement as a certified peace officer in the State of Texas for over 5 years. I am assigned to the criminal investigation division of the Ellis County Sheriff's Department and am currently investigating criminal offenses, including murder and/or capital murder, most likely committed by JASON MASSEY. The victims of the murders and/or capital murders were Christina Benjamin and Brian King. I have good reason to believe and do believe the following:

A. That Christina Benjamin and Brian King were found dead in Ellis County, near Telico, east of Ennis and some 15 miles east of Garrett, on the 29th of July, 1993. Christina Benjamin was found to have been shot in the back, decapitated, slashed, her hands cut off, sexually mutilated and disemboweled. Her body had been carried some 100 feet off of an isolated country, bottom-land road and placed in a wooded area more or less out of view from the road. She was 13 years of age, blond pretty and had been known to leave her house during the night time.

B. That Brian King was found dead some 100 yards from Christina, shot in the head, pushed/thrown/fell off a wooden bridge and was lying in the creek bed. He was 14 years old.

C. That JASON MASSEY, hereinafter referred to as "suspect", resides in a house at 527 Big Rock Road, Canton, Van Zandt County, Texas, the mailing address is 527 Big Rock Road, Canton, Texas. The house is generally described as a one story red brick house with a white roof with an attached open carport.

D. The suspect Jason Massey is the owner of a 1982 four-door Subaru vehicle bearing Texas License 270XVG having a vehicle identification number of JF1AB43BXCB20826. The suspect is known to drive this vehicle.

E. The suspect Jason Massey is a twenty year old white male, 6 feet in height, blue eyes, blonde hair and weighing 165 pounds.

F. On the 31st of July, 1993, I interviewed a man named Mark Gentry who is a resident of Ellis County, Texas, who gave me a statement which indicated the following:

APR 07 1994

i. On or about the 17th of July, 1993, while at the residence of Mark Gentry, Chris Nowlin told him, Mark Gentry, that Jason Massey and Nowlin were supposed to go to Christina Benjamin's (a victim) residence on July 16, 1993, at approximately 12:00 midnight and honk the horn twice. Christina was to meet Chris Nowlin and Jason Massey at the Shamrock Station, Fm 879 and I45, in Ellis County. Chris Nowlin indicated that Massey had wanted to take Benjamin out and kill her, that Chris Nowlin had told him that he wanted no part of it because he (Chris Nowlin) was dating Christina at the time.

ii. On another occasion, Mark Gentry was riding around with Jason Massey through the backroads drinking beer and Jason kept pointing out places that he indicated would be good places to hide a dead body.

iii. Gentry indicated that he had known Jason Massey to cut off the heads of cats and dogs calling them his "trophys" and store them in a red rusty metal cooler in the woods near his then home in Ellis County. He (Gentry) also indicated that on the 18th of July, 1993, while at Lake Bardwell in Ellis County, Jason Massey told Gentry that if he (Gentry) heard about a serial killer around the Ennis area to not worry that it would be him, Jason Massey.

G. On the 31st of July, 1993, in a separate interview, I interviewed Chris Keith Nowlin, also of Ellis County, residing at 202 Bluebonnet, Ennis, Texas, who told me that on July 16, 1993, he (Chris Nowlin) had been with Jason Massey in a tan or beige four door Subaru car and at approximately 8:00 p.m. they talked to Christina Benjamin (subsequent victim) and her brother (also subsequent victim) and made plans with Christina Benjamin to meet them at the old Fina station at FM 879 and I45. Massey indicated to Nowlin that he wanted to have sexual intercourse with Christina Benjamin and then kill her. Massey also said that he wanted to cut Christina Benjamins' "pussy lips" [labia majora] off and fry them and then eat them. Nowlin indicated that he did not think too much about Jason saying these things because Jason talked frequently about killing women. He also indicated that Jason Massey likes to kill and decapitate animals as he has seen Jason carry a dead cat in his car in a plastic bag. Massey would continue to talk to the cat as though it was alive. On that occasion Nowlin and Jason did not pick up Christina Benjamin because Mark Gentry had gotten cut (stabbed) and taken to the hospital and Nowlin had passed out from drinking too much.

H. The incidents and behavior described in the statements given by Mark Gentry and Chris Nowlin are indications of Jason Massey's probable involvement in the murder and/or capital murder of Christina Benjamin and Brian King because the two juveniles disappeared in the early morning hours of the 27th of July, 1993, after most likely having been picked up in much the way that was described in Chris Nowlin's statement. There was apparently a horn honk at the residence of the two juveniles and James King, the father of Brian King, and the live-in boyfriend of the mother of Christine Benjamin, has indicated to this officer that he saw a vehicle generally matching the description of the beige Subaru. That there was conversation overheard by other children in the house indicating that the two juveniles were going to be going to a nearby gas station at FM 879 and I45. The bodies of the two juveniles were later discovered on the 29th of July, 1993, in a rural area of Ellis County, heavily wooded, and the body of Christina Benjamin had been

TW APR 07 1994 161

decapitated and otherwise mutilated, with severing of hands and slashing of the body and in particular, cutting of the labial area of her body.

 I. In July of 1993, the tan Subaru bearing license no. 270XVG, owned and/or driven by Jason Massey was stopped by Ennis Police Officers Sid Lopez and Touncey Hart and at that time Jason Massey was arrested on charges of Possession of Marihuana. An inventory was done incident to the arrest of Jason Massey and during the search of the vehicle it was discovered that in the vehicle was a three bladed axe, another more common axe, a hatchet, a large knife, a claw hammer, and what appeared to be a satanic "bible". Inside the bible was a list of what appeared to be girls names, at least one of the names was recognized by the Ennis Officer as being a young Ennis girl. This officer states that any or a number of the items taken from the vehicle could have been used in the mutilation and/or murder of Christina Benjamin.

 J. This officer has developed information that Jason Massey was in Garrett/Ennis on the night prior to the apparent abduction, that is Monday, the 26th of July, 1993, was seen between 5:00 and 6:00 p.m. and then subsequently seen at his girlfriend's work place at around 11:00 p.m. Ennis is only a few miles from the victims' home.

 K. The medical examiner's office at Southwest Forensic Sciences (Dallas County Coroner's Office) indicates that there were fibers found of the left foot of the victim that match the kind of fibers found in floormats of Japanese types of vehicles and that the fiber material was brown in color. The aforementioned 1982 owned and/or driven by Jason Massey has dark brown interior carpeting and is a Japanese make of car.

 L. On Saturday, the 31st of July, 1993, an anonymous call was placed to the Ennis Police Department by a male caller who indicated that Jason Massey had told him that he was going to kill Christina Benjamin and Brian King and how and where it was to be done, though specific information was not provided to the Ennis Police Department.

 M. It is believed that the Subaru vehicle described above was used in commission of the murder and/or capital murder and the person of the two juveniles was transported in the vehicle and then possibly one or more of their bodies were transported, therefore, it is believed that there will be trace evidence of blood, fluids, hair, other possible fibers from the clothing or person of one or both of the individual juvenile victims and the vehicle may still contain weapons that might have been used in the commission of the murder and/or capital murders.

 N. It is believed that the residence and/or automobile of Jason Massey may contain weapons used in the commission of the murder, possibly body parts of the female victim (Christina Benjamin) as there is indication that in the past he had kept animal body parts in his home when he lived in Ellis County and possible items of a clothing or other personal items belonging to the victims.

 Wherefore, affiant requests the issuance of a warrant that will authorize members of the Ellis County Sheriff's Office and Affiant and other peace officers acting by and under the direction of the Ellis County

162

APR 07 1994

Sheriff's Office or acting pursuant to their instructions to search the above described home together with any vehicles, outbuildings, mobile homes, trailers or attachments thereto as well as the front, sides, back yards and curtilage thereof in order that they may locate the following items:

1. Any items that might constitute a weapon used in the commission of the offenses described above including axes, hatchets, knives, bayonets, saws, letter openers, screwdrivers, any other sharp pointed object or tool,

2. Any and all firearms, pistols, rifles, shotguns,

3. Any items which may constitute evidence of criminal acts or violations involving assaults, sexual assaults, mutilation, abuse or cruelty to animals, obscenity, pornography, child abuse, sexual abuse, sexual performance, murder, or capital murder and kidnapping,

4. Any and all books or publications, any books, journals, pamphlets, magazines, photographs, photographic papers, film, negatives, registered correspondence, catalogs which may have to do with pornography, sexual acts, satanic culture, satanic acts, satanic studies, memberships in satanic organizations. or *serial murders, serial murderers or multiple killer* J.C Tw

5. Correspondence, diaries, or any other writings, tape recordings or letters relating to any juvenile or adult which would show the identity of a juvenile or adult engaged in any kind of sexual contact between juveniles and adults

6. Any articles of clothing, or any other personal property including but not limited to purses, billfolds, identification, driving licenses, photographs, or other similar documents belonging to Christina Benjamin, Brian King or any other person not a resident of the above described household.

7. Receipts, charge slips, charge cards which might show the whereabouts of the said Jason Massey on the days in question during July, 1993, articles of personal property including clothing owned by Jason Massey which may contain trace evidence which is linkable to one or more of the victims.

8. Any item of whatsoever nature that might contain or have located therein blood or any other type of human or animal body fluid.

9. Any diaries or journals or other personal notes kept by or compiled by the suspect Jason Massey that contain lists of names of victims or proposed victims of the said suspect.

_____
AFFIANT

Subscribed and sworn to before me by the said Affiant on this the
_2_ day of *August*____, 19 _93_.

APR 07 1994