# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00782-CR

**Derrick L. Davis, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. D-1-DC-10-904084, HONORABLE JON W. WISSER, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Derrick Davis and Whitney Sneed-Moore are the parents of M.D. At the time relevant to this appeal, Davis was the primary caregiver for M.D. A few months after M.D. was born, Sneed-Moore left M.D. in Davis's custody and went to work. When she returned home from work, she checked on M.D. and noticed that M.D. appeared to be sleeping. When she went to check on M.D. later in the evening, she noticed that one of M.D.'s eyes had blood in it. Sneed-Moore asked Davis what happened, and he said that M.D. had fallen off of the bed. Shortly thereafter, M.D. had a seizure. In response, the couple called 911, and M.D. was rushed to a nearby emergency room. While she was in the hospital, M.D. was treated for significant head trauma and other injuries, and she stayed in the intensive care unit for weeks before being released.

Initially, Davis told the police that M.D. had fallen off of a bed or couch or had been hurt when he rushed to the kitchen while carrying her. After the police conducted an investigation,

Davis was arrested, and a trial was scheduled. At the end of the trial, the jury concluded that Davis was guilty of injury to a child with serious bodily injury and aggravated assault. Davis elected to have the district court assess his punishment, and the district court imposed a prison term of 15 years for both counts and ordered that the punishments run concurrently.

Subsequent to receiving his sentence, Davis appealed the district court's judgment of conviction.

## DISCUSSION

In his sole issue on appeal, Davis argues that the district court erred by admitting into evidence M.D.'s medical records because the requirements for the admission of self-authenticating documents under rule of evidence 902 were not complied with. *See* Tex. R. Evid. 902. We review a trial court's "admission or exclusion of evidence under the abuse of discretion standard." *Hawkins v. State*, 89 S.W.3d 674, 678 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Under that standard, a trial court is "given wide latitude" regarding its decision to admit or exclude evidence. *Id.* Provided that the ruling was "within the zone of reasonable disagreement," the trial court's ruling will be upheld. *Id.*

The State sought to admit some of M.D.'s medical records as business records under rule 902(10). Tex. R. Evid. 902; *see Adams v. State*, 985 S.W.2d 582, 583-84 (Tex. App.—Eastland 1998, pet. ref'd) (concluding that district court did not abuse its discretion by admitting medical records under rules of evidence). Rule 902 states that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required" for certain types of documents. Tex. R. Evid. 902. The rule provides that any record, "which would be admissible under Rule 803(6) or (7) shall

2

be admissible in evidence in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of Rule 803(6) or (7), that such records attached to such affidavit were in fact so kept as required by Rule 803(6) or (7)," provided that the record and the affidavit "are filed with the clerk of the court . . . at least fourteen days prior to the" start of the trial and provided that the other parties are given "prompt notice" that the records have been filed. Tex. R. Evid. 902(10). Further, the rule provides that the "records shall be made available to the counsel for other parties to the action or litigation for inspection and copying." *Id.*

The State attempted to file the medical records with the district clerk approximately 30 days before the trial was set to be held, but the district clerk informed the State that there was not enough room in the clerk's office to store the medical records and asked the State to store them in its offices in the same building. During the trial, the medical records were offered, but Davis objected to their admission on the ground that "not keeping the filed business records in the district clerk's office was a violation of" rule 902(10), and Davis repeats that assertion on appeal.

We note that the rule does not address situations in which a clerk's office refuses to store records filed under rule 902; however, we also note that the State made efforts to comply with the remaining requirements of the rule. Although the clerk's office did not keep the medical records, the State attempted to file the records well before the deadline expressed in rule 902. *See id.* Moreover, the State notified Davis that it had attempted to file the records but that the clerk asked the State to store the documents. Further, the State informed Davis that the documents were in the district attorney's office, and Davis's attorney went to the district attorney's office to review the documents prior to trial. Moreover, when the district court was informed of the matter, it gave Davis

3

permission to take the records home to review them before they were admitted into evidence, and it also offered to provide Davis with a copy of the records. In addition, when challenging the district court's decision to admit the documents, Davis made no allegation that any of the documents had been altered.

In light of the preceding, we are not persuaded that the district court's decision to admit the medical records under rule 902(10) was outside the zone of reasonable disagreement. However, even assuming that the district court's ruling was improper, we would still be unable to sustain Davis's issue on appeal. When deciding whether an error is reversible error, appellate courts must determine if the error is constitutional or non-constitutional in nature. *See* Tex. R. App. P. 44.2. The erroneous admission of evidence is not constitutional error. *See Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Accordingly, the error must be disregarded unless it affected substantial rights. Tex. R. App. P. 44.2(b). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In performing this analysis, the reviewing "court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Motilla*, 78 S.W.3d at 355.

The medical records at issue detailed the injuries that M.D. sustained prior to her arrival at the hospital and the treatment that she underwent after her arrival. As a preliminary matter, we note that Davis does not argue that the admission of the medical records harmed his substantial rights. In any event, the same information contained in the medical records was related to the jury without objection through other exhibits and through the testimony of various witnesses.[1] *Cf. Massey v. State*, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996) (explaining that if defendant objects to admission of evidence but same evidence is later admitted from different source, defendant waives objection); *see Webber v. State*, 21 S.W.3d 726, 730 (Tex. App.—Austin 2000, pet. ref'd) (stating that "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling"). For example, Sneed-Moore testified that when she went to check on M.D., she noticed that M.D. had a black eye and then saw M.D. throw up and start seizing. Furthermore, Sneed-Moore explained that when they arrived at the hospital, the doctors hooked M.D. up to a ventilator, gave her a transfusion, and put her in a medically-induced coma. In addition, Sneed-Moore testified that as a result of her injuries, M.D. was in the hospital for a month.

In addition to the testimony from M.D.'s mother, two individuals who responded to the 911 call also testified regarding M.D.'s injuries. First, Robert King testified that he works for the Pflugerville Fire Department and related that when he arrived on the scene, M.D. was unconscious, had blood in one of her eyes because some of her blood vessels had broken, and had

---

[1] It is worth noting that in response to a request by Davis, the district court redacted portions of the exhibit that mentioned that Davis had made threatening statements to various medical personnel and that detailed incidents that Davis had with hospital security.

abdominal bruising. During King's testimony, the district court admitted a report prepared by King that listed M.D.'s injuries.

After King concluded his testimony, the State called paramedic Cheryl Bakhtiari. In her testimony, she stated that the injuries M.D. exhibited "most likely could have only happened deliberately." When describing what she saw, she said that M.D.'s face was red, that one of M.D.'s eyes was bloodshot, that M.D. had a bruise on her abdomen, and that the two soft spots on M.D.'s head "were not sunken" as they should have been and were instead "flat, not quite bulging, but almost." Regarding the soft spots, Bakhtiari testified that their appearance was indicative of brain swelling. During her testimony, Bakhtiari also read portions of a report prepared by another paramedic that was admitted into evidence. Those portions described M.D. as sustaining serious injuries and listed that M.D. had a large contusion and broken blood vessels of the eye and suffered a seizure on the way to the hospital.

During the trial, three of M.D.'s treating physicians testified. First, Dr. Robert Vezzetti was called to the stand. He was the pediatric emergency physician who treated M.D. when she arrived at the hospital. Dr. Vezzetti testified that M.D. was unresponsive and not breathing on her own when she arrived at the hospital and had a seizure in the emergency room. In addition, he related that her condition was "very critical. She [was] not breathing. So because of that, she ha[d] potential for respiratory arrest . . . . [and] cardiac arrest." In his testimony, Dr. Vezzetti explained that they put M.D. on a ventilator because she was not breathing sufficiently on her own. Further, he related that the right side of M.D.'s face was swollen and bruised and that she had a "subconjuctival hemorrhage" or blood in her right eye. Regarding the injury to the eye, Dr. Vezzetti stated that it can

6

be caused by a blow to the eye or trauma to the head. Dr. Vezzetti agreed that M.D. had suffered "serious bodily injury" and also postulated that M.D.'s injuries placed her in serious risk of death.

In his testimony, Dr. Vezzetti explained that he did not believe that M.D.'s injuries could have been caused by falling off of a bed or by accidentally bumping the baby's head on a wall; on the contrary, he insisted that the injuries that M.D. sustained were likely caused by "[r]eally violent force" and by "either violent shaking or violent throwing." He also described M.D.'s injuries as being caused by "acceleration/deceleration forces" and explained that the injuries could have been caused if M.D. was thrown at a wall or another hard surface.

During his testimony, Dr. Vezzetti's medical notes from the night that M.D. was taken to the hospital were admitted into evidence. The notes indicated that when M.D. arrived, she was "not really active" and had a low score on the coma scale that the doctors use to assess patients. The notes also stated that she was in "severe distress, lethargic and unresponsive," that she was not breathing normally, and that M.D. was not responsive to pain. In addition, the report chronicled the injuries to M.D.'s eye and abdomen and revealed Dr. Vezzetti's impression that M.D.'s injuries were not the result of accidental trauma.

The State also called Dr. Renee Higgerson to the stand. Dr. Higgerson is a pediatric intensive care physician who treated M.D. after she was transferred to the intensive care unit. In her testimony, Dr. Higgerson explained the efforts that were undertaken to lessen the pressure on M.D.'s brain and to stop the seizures, including naming the medicines that were administered, the tests that were performed, and the need to put M.D. in a medically-induced coma. In addition, Dr. Higgerson related that M.D. had "intermittent but very recurrent" seizures for the first week. Dr. Higgerson

7

also testified that when they examined M.D., they noticed that M.D. had fractures to her femur and tibia bones of her right leg, and Dr. Higgerson explained that those fractures were recent and that the femur bone is very difficult to break. Moreover, Dr. Higgerson testified that M.D. had "six rib fractures" and that the fractures occurred a few weeks before M.D. was taken to the hospital. When describing the totality of M.D.'s injuries, Dr. Higgerson testified that M.D. was "as critical as you can possibly be. We explained to the family the first night that there was a very significant chance that she would die." Moreover, Dr. Higgerson related that the injuries were caused by "a great deal of force" and that she did not believe that the injuries could have been caused accidentally. In fact, Dr. Higgerson stated that in the absence of a multi-story fall or a car accident, M.D.'s injuries were likely caused by someone beating her. Dr. Higgerson also testified that all of the injuries were consistent with someone grabbing M.D. by the leg and slamming her into something.

In addition to the testimony from the two doctors from the hospital, the State called M.D.'s pediatrician, Dr. Elise Kibler, to testify regarding the injuries that M.D. sustained and her prognosis. In her testimony, Dr. Kibler explained that as a result of M.D.'s injuries, she "is unable to control the movement of her right eye" and has poor strength on half of her body. Further, Dr. Kibler related that she did not expect M.D.'s difficulties to "change in any significant way." In addition, Dr. Kibler stated that M.D. is "at a very high risk for intellectual and IQ problems." Also, Dr. Kibler testified regarding the injuries that M.D. sustained, including damage to multiple parts of her brain and fractures to her legs, and clarified that the type of force that had been applied to M.D. was "similar to that of a car accident." Moreover, Dr. Kibler explained that the widespread nature of M.D.'s injuries demonstrated that M.D. had sustained multiple blows to the head.

8

In addition to calling the physician witnesses described above and admitting the medical records at issue, the State admitted without objection a copy of M.D.'s medical discharge papers from the intensive care unit, which provided a summary of her injuries and treatment. Also, photos of M.D. that were taken while she was in the hospital were admitted into evidence without objection.

Finally, evidence was introduced regarding statements that Davis made about how M.D. had been injured. During the trial, two signed statements by Davis were admitted and read to the jury. In the first statement, Davis asserted that M.D. was hurt when she fell off of the bed and hit her head on various objects. In the second statement obtained later, Davis related that two weeks before M.D. was admitted into the hospital, he became upset with M.D. "because she would not stop crying, so I picked her up and squeezed her ribs." Regarding how M.D. was hurt on the night that she was taken to the hospital, Davis explained that M.D. "was crying and would not stop and [he] snapped. [He] slapped [M.D.] three times in the face. I then slammed her head into the wall one time. I am tired of beating up my own daughter. I need someone to help me."[2] In addition, Detective Ramon Lopez testified that when he talked to Davis about what happened, Davis initially stated that M.D. fell off of the bed but later admitted that a few weeks before M.D. was taken to the hospital, he grabbed M.D. "and squeezed her too tight." Similarly, an investigator for Child Protective Services, Mike Bradburn, testified regarding an interview that he had with Davis. According to Bradburn, Davis originally stated that M.D. was hurt when she fell from the bed or a couch in the living room but later stated that M.D. may have been hurt when he ran to the kitchen

---

[2] Davis waived his right to remain silent and testified at trial. In his testimony, Davis stated that he told the police that he had hurt M.D. in order to cover for Sneed-Moore. He also testified that the various versions that he told the police regarding how M.D. was hurt were "all lies."

holding M.D. Specifically, Bradburn related that Davis said that M.D.'s head hit the wall when he was running. In addition, Bradburn discussed the injuries to M.D.'s ribs and stated that Davis admitted that the injuries to M.D.'s ribs were caused when he squeezed her too tight out of frustration.

In light of the evidence summarized above, we must conclude that any error stemming from the district court's decision to admit into evidence the disputed medical records did not have "a substantial and injurious effect or influence in determining the jury's verdict" and therefore did not affect Davis's substantial rights. *See King*, 953 S.W.2d at 271. Accordingly, we hold that any error would be harmless and overrule Davis's issue on appeal. *See* Tex. R. App. P. 44.2(b).

## CONCLUSION

Having overruled Davis's sole issue on appeal, we affirm the district court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Henson, and Goodwin

Affirmed

Filed: August 16, 2012

Do Not Publish

10