Affirmed and Opinion filed November 3, 2005









Affirmed and Opinion filed November 3, 2005.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00287-CR

____________

 

JOHN PAUL MARTINEZ, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 337th
District Court

Harris County, Texas

Trial Court Cause No. 978,955

 



 

O P I N I O N

Appellant, John Paul Martinez, was
convicted by a jury of capital murder. 
Because the State did not seek the death penalty, the trial court
assessed his sentence at incarceration for life in the Texas Department of
Criminal Justice, Institutional Division. 
In his sole issue on appeal, appellant contends the trial court erred in
refusing his requested instruction on the lesser included offense of felony
murder.  We affirm.

 








                                                  Background

Gene Bautista was second-in-command of a
street gang known as the Latin Kings. 
Cecil Duke, who met Bautista through a mutual friend, bought cocaine,
ecstasy, and marijuana from Bautista, and sold it for him as well.  Duke was not a member of the Latin Kings, but
was being watched and evaluated for possible membership in the gang.  

Bautista asked Duke if he Awould be willing
to pull a lick,@ i.e., a robbery, of four kilos of cocaine,
with a street value of $13,000 to $15,000. 
Less than a week later, Duke saw Bautista at the trailer where Bautista
was staying.  Bautista was receiving a
tattoo from appellant.  They discussed
the robbery Bautista had mentioned to Duke earlier.  Appellant said the people they were going to
rob were his cousins.  Appellant further
explained that they were going rob them Aphysically,@ i.e., overpower
and manhandle.  

Bautista decided that they would take guns
and tie up the victims.  However, by the
end of the evening, the plan had evolved such that appellant was going to kill
them because if their father found out, he would come after appellant.  Duke did not believe appellant was going to
kill them because A[h]e just ran his mouth too much.@  

On November 25, 2002, Bautista called Duke
asking if he was ready to commit the robbery. 
When Duke arrived at the trailer, Bautista and appellant were
there.  A 9 millimeter pistol and a
sawed-off shotgun were on a table. 
Bautista said they were going to take guns.  After calling the complainant, Armando ASpeedy@ Gonzalez, Jr.,
from his cell phone, appellant stated that they needed to kill some time
because Speedy was not going to be at home for a while.  They went to a nude bar where appellant=s girlfriend,
Vicki Morton, was a dancer.  They left
the bar after about 45 minutes when Bautista said they needed to collect some
money.  








When they arrived at Speedy=s house, appellant
became nervous because there was a red pickup truck in the driveway that he did
not recognize.  Appellant called Speedy=s father, Armando
Gonzalez, Sr., from his cell phone and asked him if he wanted a tattoo.  Gonzalez was in Shreveport, Louisiana.  The purpose of the phone call was to
determine if Gonzalez was at the house. 
Appellant then called Speedy and told him they wanted to buy drugs.  Speedy did not want them to come to the house
and asked them to meet him at a Jack-In-The-Box.  When they arrived at the Jack-In-The-Box,
however, they saw a Houston Police Department officer eating inside.  

They decided to meet at a nearby apartment
complex.  When they arrived, appellant,
armed with the 9 millimeter pistol, approached Speedy=s car, got in the
passenger side, and closed the door while Duke and Bautista remained in their
car.  Duke heard a pop that sounded like
a gunshot.  The driver=s side door of
Speedy=s car opened, and
Speedy and appellant were on the ground fighting.  Appellant then put the gun to Speedy=s head.  Bautista got out of the car with the shotgun
and told Duke to follow them.  Duke saw
Bautista hit Speedy in the head with the shotgun.  Bautista and Speedy got in the back seat of
Speedy=s car and
appellant got in the driver=s seat.  Duke followed them in the other car. 

When they got to Speedy=s house, Bautista
and appellant ordered Speedy to get on the floor in the living room.  Bautista brought Speedy=s brother, Vincent
Ortega, out from the bedroom and ordered him to be quiet and lay down on the
floor.  Speedy was then moved into the
hallway.  Bautista asked Speedy where the
money and drugs were.  Speedy said they
were under the couch in the living room. 
Duke retrieved 3,500 ecstacy pills, one pound of marijuana, four ounces
of cocaine, and $1,800 in cash.  

Appellant then got some duct tape from the
kitchen.  Appellant used the duct tape to
bind Speedy first.  Speedy pleaded with
appellant not to kill him, but appellant ordered Speedy Ato shut up, take
it like a man.@ 
Appellant taped Speedy=s legs and hands
and Ahe taped from
[Speedy=s] neck to his
forehead.@  








Appellant then taped up Vincent.  Duke could hear Vincent Atrying to gulp for
air.@  At this time, Speedy was not moving.  Appellant repeatedly kicked Vincent, who was
still struggling, in the head:  A[appellant] was
kicking him like he was trying to kick a football.@  Every time appellant kicked, Vincent=s head hit the
door jam.  Blood started Ato shoot@ from tape around
Vincent=s forehead.  Duke heard appellant yell, AI told you not to
f--- with me.  I told y=all.  Y=all didn=t know who you
were f---ing with.@ 
Duke believed this was a vendetta or retaliation.  Vincent had stopped struggling, but appellant
stomped on him a couple of times to make sure he was dead.  Bautista and appellant put Vincent in the
bathtub and turned on the hot water.  

In addition to taking the drugs, the
money, a DVD player, some DVDs, and a chrome .380 pistol, they also took the
telephones because of the caller ID. 
Duke and appellant took the red pickup truck, which belonged to
Vincent.  They returned to the trailer
where they split the money and drugs among themselves, and left the pickup
truck at an apartment complex across the street.  They took off all of their clothes and
Bautista bleached them and then either threw them away or burned them.  

Speedy=s father and
Vincent=s stepfather,
Armando Gonzalez, Sr., arrived home around 5:30 p.m. on November 27, 2002, from
his job in Shreveport.  Gonzalez found
the door was open.  When he walked in the
house, he saw Speedy laying face down in the hallway.  Speedy=s hands and feet
were bound with duct tape, while duct tape was wrapped completely around his
head covering his eyes, nose, and mouth. 
When Gonzalez discovered the phones had been pulled out, he called 911
from the cell phone in his truck.  He did
not know Vincent=s body was in the bathtub and waited
outside for the police.  The police found
Vincent face down in the bathtub with his hands and feet bound with duct tape
and his entire faceCfrom above his eyes down to his chinCcovered with duct
tape.  The faucet in the tub was still
running and there were footprints on Vincent=s back.  

With regard to Speedy, the autopsy report states:








There is red duct
tape over the head including the face from just above the eyebrows at the mid
upper portion of the forehead to the anterior aspect of the chin below the
lower lip covering the entire face within this area.  The free end is visible anteriorly at about
the mid portion.  The tape is looped
around six times, approximately, over the head and face and posteriorly there
is a loop to the back of the neck.  The
loop is slightly loose and the other wrappings are tight.

The medical examiner further testified the
duct tape left an imprint on Speedy=s face, suggesting
that the binding was sufficiently tight to occlude the oral and nasal
airways.  The cause of death was asphyxia
due to compression and suffocation.  

With regard to Vincent, the medical
examiner testified there was a laceration over the left eye, contusions on the
left side of the head, and contusions over the rib cage and back consistent
with being stomped on.  The cause of
Vincent=s death was
asphyxia due to suffocation and blunt head trauma.  The abrasions and contusions were sustained
before death. 

                                      Lesser-Included Offense

In his sole issue on appeal, appellant
contends the trial court erred in refusing to give a requested instruction on
felony murder.  Appellant complains that
the trial court=s refusal to give a lesser-included
instruction on felony murder resulted in his being given an automatic life
sentence for capital murder, precluding a punishment hearing to which he would
have been entitled if he had been convicted of murder.  Appellant argues, therefore, there is some
harm because while a conviction for capital murder requires him to serve 40
years before he is eligible for parole, under a conviction for murder, he would
be eligible for parole in 30 years for a life sentence.  

AIn a prosecution for an offense with
lesser included offenses, the jury may find the defendant not guilty of the
greater offense, but guilty of any lesser included offense.@  Tex.
Code Crim. Prod. Ann. art. 37.08 (Vernon 1981).  Article 37.09 of the Texas Code of Criminal
Procedure provides for an instruction of a lesser included offense under the
following circumstances:

An offense is a
lesser included offense if:








(1) 
it is established by proof of the same or less than all the facts
required to establish the commission of the offense charged;

(2) 
it differs from the offense charged only in the respect that a less
serious injury or risk of injury to the same person, property, or public
interest suffices to establish its commission; 

(3) 
it differs from the offense charged only in the respect that a less
culpable mental state suffices to establish its commission; or

(4) 
it consists of an attempt to commit the offense charged or an otherwise
included offense.

Tex. Code Crim.
Proc. Ann. art. 37.09 (Vernon 1981).

Texas courts employ a two-prong test in determining
whether an instruction on a lesser included offense must be given.  Hampton v. State, 109 S.W.3d 437, 440
(Tex. Crim. App. 2003).  Whether the
instruction is requested by the defendant or the state, both prongs must be
satisfied.  Id.; Arevalo v.
State, 943 S.W.2d 887, 890 (Tex. Crim. App. 1997).  First, the court determines whether the
lesser offense is a lesser-included offense of the offense charged as set forth
in article 37.09.  Moore v. State,
969 S.W.2d 4, 8 (Tex. Crim. App. 1998). 
Second, the court determines if there is some evidence which would
permit a rational jury to find that, if guilty, the defendant is guilty only of
the lesser offense.  Id.  In other words, there must be some evidence
from which a rational jury could acquit the defendant of the greater offense
while convicting him of the lesser offense. 
Threadgill v. State, 146 S.W.3d 654, 665 (Tex. Crim. App.
2004).  

Felony murder is a lesser-included offense
of capital murder.  Salinas v. State,
163 S.W.3d 734, 741 (Tex. Crim. App. 2005). 
The only difference between felony murder and capital murder is the
culpable mental state.  Id.  While capital murder requires an intentional
cause of death, culpable mental state in felony murder is supplied by the
mental state accompanying the underlying felony.  Id. (citations omitted).  Thus, the first prong here is satisfied.  








With respect to the second prong, there
are two ways in which the evidence may indicate a defendant is guilty only of
the lesser offense.  Saunders v. State,
840 S.W.2d 390, 391 (Tex. Crim. App. 1992). 
First, there may be evidence which refutes or negates other evidence
establishing the greater offense.  Schweinle
v. State, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996).  Second, a defendant may be shown to be guilty
of the lesser offense if the evidence presented is subject to different
interpretations.  Id.  

The reviewing court must consider all the
evidence introduced at trial, whether produced by the state or the
defendant.  Penry v. State, 903
S.W.2d 715, 755 (Tex. Crim. App. 1995). 
Anything more than a scintilla of evidence is sufficient to entitle a
defendant to a lesser charge.  Forest
v. State, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999).  The evidence must establish the lesser
included offense as a Avalid, rational alternative to the charged
offense.@  Arevalo, 943 S.W.2d at 889.  

At issue here is whether the evidence demonstrates
appellant had the intent only to rob Speedy, not the intent to kill him.  See Salinas, 163 S.W.3d at 742.  Appellant contends that the testimony of two
witnesses is subject to two interpretations. 
The first witness is Connie Park, who is assigned to the Homicide
Division of the Houston Police Department. 
Appellant asserts that while Park believed that killing Speedy and
Vincent was intentional, she conceded that the possibility existed that the
duct tape was placed around their heads by someone Awho didn=t know what they
were doing,@ intending to restrain them, not to kill
them.  Park testified on cross-examination:

Q. 
Sure.  Because the whole point of
the duct tape is a [sic] restrain them, restrict the movements, and to put it
around their face to keep them from talking or yelling; am I correct, Officer?

A. 
Correct, and not breathing.

Q. 
Well, I mean, if the person doesn=t know what they=re doing, but the objective is if he keeps them from
talking -- 

A. 
Correct.

                                                    *        *       
*








Q. 
They go rob somebody and then they leave, right?  That=s kind of the genuine pattern, you put duct tape on the
person, secure their hands and their mouth and then you leave after you rob?

                                                    *        *       
*

A. 
Not -- not covering their whole face, though.

Q. 
All right.  But I=m saying, the person didn=t know what they were doing, put
the duct tape on the person -- 

A. 
Sure, you can say that.  

Q. 
-- to keep them from talking or yelling out.  Am I correct, ma=am?

A. 
Sure, you can say that.

Q. 
These men were not executed, pistols, gut put the back [sic] of the head
and shot?  You didn=t see that?

A. 
No gunshot wounds.

On redirect examination, Park testified:

Q. 
One quick question.  Looking at
all of the evidence, I=m talking about every person you
talked to, and every piece of physical evidence that you looked at, using all
of the -- all of your experience and training, did you -- did you come to any
other conclusion but this was an intentional killing or somehow just some
botched up, trying to keep somebody quiet?

A. 
This was very intentional.  

On recross-examination, Park further testified:

Q. 
. . . I=m saying that the prosecutor just
asked you a question.  You have to
speculate on the intention, don=t you?

A. 
Correct.

Q. 
All right.  So you said it was
intentional.  That=s your guess?

A. 
It=s not my guess.  It=s from the evidence that was found at the location.

                                                    *        *       
*








Q. 
And the question I am asking, again, when the prosecutor said -- he gave
you two alternatives.  You are not saying
that this could have been botched, because you said they were restraining the
people, right?  We=ll agree with that, right?

A. 
Yes, sir.

Q. 
And my point is, that you, with your experience, you know if you want to
kill them, just kill them.  Right?

A. 
Sure.

Q. 
That wasn=t done here, right?

A. 
They were killed. 

Q. 
I=m saying with a weapon, shot.  These men were not shot in the back of the
head, executed Houston-style, were they?

A. 
The duct tape were weapons [sic].

Q. 
Officer, but the point is, you don=t know yourself if the application of that duct tape was
what -- that that was an intentional act or it was a botched act by the people
who didn=t know what they were doing?  Don=t know that, Officer, do you?

A.  No, I don=t.

The second witness, whose testimony appellant claims raises
the felony murder instruction, is Vicky Morton, his girl friend at the time of
the offense.  Morton testified on direct
examination that appellant did not kill anyone, but he was at the scene:

A. 
The news came on and [appellant] jumped up and said, I might be on the
news.

                                                    *        *       
*

Q. 
Do you remember asking him if he had killed anybody?

A. 
Yes, I do.  I remember now.  It=s been a long time.

Q. 
What did he say when you asked him that?

A. 
He said, no, but he was there.

Q. 
What else did he say?

A. 
He said -- I said, how?  I asked
him, well, how did they die?  And he
replied, execution style, or something like that.

Q. 
Did you ask him if he killed them?

A. 
Yes.








Q. 
Did he say anything to you?

A. 
No.  He said, no.  I=m not too sure about this.

                                                    *        *       
*

Q. 
Do you remember telling [Sergeant Kennedy] that when you asked
[appellant] if he killed them, he didn=t say anything to you?

A. 
[Appellant] never told me he killed anybody.

On cross-examination, Morton testified:

Q. 
In fact, all that was told to you was that [appellant] was there.  He said -- he told you he was there?

A. 
Yes.

Q. 
Okay.  And you asked [appellant]
something to the effect of how they died, and he said they were killed
execution style.  He didn=t -- 

A. 
Yeah.

Q. 
-- he didn=t say, AI killed them execution style,@ did he?

A.  No, he didn=t.  

Appellant argues his comment to Morton,
i.e., that he did not kill anyone, but he was there, is subject to two
interpretations.  Appellant states one
interpretation, as argued by the prosecutor at trial, is that he denied any
involvement in the crime, but was merely present at the crime scene.  Appellant contends his comment, when
considered with Park=s (purported) concession that duct tape is
used to restrain people, and her testimony that whether a person who wraps another
in duct tape intends to kill the victim or whether the killing is just a Abotched@ job is subject to
speculation, can be interpreted as he 
was there, he put duct tape over the victim, but he did not think he
killed anyone, i.e., he did not intend to kill anyone.  








Appellant points out there was no
testimony that he knew, as they left the Gonzalez house, that either Speedy or
Vincent was dead.  Also, Duke did not
testify about any post-crime comments by appellant indicating his awareness
that the victims were dead.  Appellant
asserts his comment to Morton that he was there, but did not kill anyone is
consistent with his not having intended to kill Speedy and Vincent, not knowing
he had killed them, and having taped the victims= head while
erroneously believing they would be able to breath through the tape.  

While appellant acknowledged his presence
at the scene and observed the killings were Aexecution style,@ he denied
participating in killing Speedy or Vincent or engaging in any conduct that
caused their deaths.  The State argues
such evidence does not show or tend to show either a lack of intent to kill or
appellant=s commission of an act clearly dangerous
to human life during the course of a commission or flight from a felony.  We agree. 
Instead, appellant=s comment that he did not kill Speedy or
Vincent cannot be viewed as anything but a denial of having committed any act
having resulted in their deaths.  A
defendant is not entitled to an instruction on a lesser-included offense where
the evidence indicates that appellant was not guilty of any offense.  Eldred v. State, 578 S.W.2d 721, 723B24 (Tex. Crim.
App. 1979); Williams v. State, 575 S.W.2d 30, 33 (Tex. Crim. App. 1979);
Gillum v. State, 792 S.W.2d 745, 748 (Tex. App.CHouston [14th
Dist.] 1990, pet. ref=d). 


With respect to Park=s response, ASure, you can say
that,@ to trial counsel=s hypothetical
questions that duct tape can be used to restrain a victim or prevent a victim
from yelling out and conclusion that the duct tape was used by a person who Adidn=t know@ what he was
doing, such testimony is not evidence entitling appellant to a lesser-included
offense instruction on felony murder. 
The fact that a witness agrees that anything is possible does not
constitute evidence for purposes of a lesser included offense.  Massey v. State, 933 S.W.2d 141, 155
(Tex. Crim. App. 1996); see also Bignall v. State, 887 S.W.2d 21, 24
(Tex. Crim. App. 1994) (A[T]here must be some evidence directly
germane to a lesser included offense for the factfinder to consider before an
instruction on a lesser included offense is warranted.@).  








Moreover, we must review the entire
record, rather than just Aplucking certain evidence from the record
and examining it in a vacuum.@  Enriquez v. State, 21 S.W.3d 277, 278
(Tex. Crim. App. 2000).  Park also
testified emphatically that it was not her Aguess@ that the killings
were intentional and the duct tape was used as a weapon.  

Because a rational jury could not have
found appellant guilty of only felony murder and not of capital murder, it was
not error for the trial court to refuse to give a lesser-included offense
instruction on felony murder. 
Consequently, appellant=s sole issue is
overruled.  

Accordingly, the judgment of the trial
court is affirmed.

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Opinion filed November 3, 2005.

Panel
consists of Justices Yates, Hudson, and Mirabal.*

Do
Not Publish C Tex.
R. App. P. 47.2(b).











*  Senior Justice
Margaret G. Mirabal sitting by assignment.