

# NUMBER 13-16-00596-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

RICHARD HYLAND,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

## On appeal from the 319th District Court
## of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Longoria, and Hinojosa
### Memorandum Opinion by Justice Rodriguez

By four issues, Richard Hyland appeals his conviction for the intoxication manslaughter of his wife, Jamie Doherty.[1]  Hyland challenges the sufficiency of the evidence to support his conviction, as well as the jury's finding that he used or exhibited

---

[1] The decedent's first name is variously spelled in the record as "Jaimie" and "Jaime," and her last name also appears as "Dougherty."

a deadly weapon—his motorcycle—during the commission of the offense.   Hyland also disputes the validity of the warrant used to draw and test his blood for intoxicants.   We reverse and remand.

## I.   VALIDITY OF THE SEARCH WARRANT

In his third issue, Hyland asserts that the warrant authorizing his blood draw was defective.   Hyland focuses on Officer Raymond Harrison's affidavit, which was submitted to a magistrate in pursuit of the warrant.   According to Hyland, the affidavit contained reckless or deliberate falsehoods that, when excised from the affidavit, render the affidavit insufficient to provide probable cause to believe that he was intoxicated.   Hyland contends that because the defective warrant violated his Fourth Amendment rights, the trial court erred in denying his motion to suppress all resulting blood evidence.

We look to the four corners of the affidavit in determining the existence of probable cause to search the identified locations.   *Massey v. State*, 933 S.W.2d 141, 148 (Tex. Crim. App. 1996).

### A.    Affidavit for Search Warrant

To obtain the warrant, Officer Harrison filled out a standard form and submitted it to a magistrate as a sworn affidavit.   The preprinted affidavit form contained several allegations concerning the suspect's intoxication offense and the officer's probable cause to believe that a blood draw would lead to evidence of the intoxication offense. Throughout the form were blanks for the affiant to enter details concerning the case facts. For instance, the introductory paragraphs were preprinted and provided only a blank for the affiant's name and term of service with the Corpus Christi Police Department (nine

2

years).   The stock language then averred that the affiant's police training "has included detection and recognition of persons who are intoxicated."

The body of the affidavit form included nine numbered paragraphs.   Officer Harrison entered Hyland's personal information in paragraph one, which described Hyland for all purposes as "the suspect."   In preprinted paragraphs two and three, the affidavit stated that the suspect was in custody and was concealing human blood, which constituted evidence of the offense described in paragraph four.   Paragraph four asserted that the suspect had operated a motor vehicle in a public place while intoxicated, leaving blanks for the date and time of the offense, which Officer Hyland entered as May 30, 2014, at 10:50 p.m.   Paragraph four also recited the statutory definition of intoxication.   *See* TEX. PENAL CODE ANN. § 49.01(2) (West, Westlaw through 2017 1st C.S.).   In paragraph five, Officer Harrison checked a box indicating his belief that the suspect was operating a motor vehicle in a public place, which was "based on . . . a witness"; he entered the contact information of two witnesses, Juan and Phyllis Ledesma, in an accompanying blank.

Paragraphs six through nine described the basis of Officer Harrison's belief that Hyland was intoxicated, which we reproduce below, with Officer Harrison's hand-written notations in the underlined blanks:

6.     I made the following observations about the suspect:

General appearance:        Bloody

Odor of alcohol:             Strong

Condition of eyes:              —

3

| | | |
|---|---|---|
| Speech: | — | |
| Attitude: | — | |
| Balance: | — | |

7. I requested performance of field sobriety tests by the suspect and recorded the results and my observations of the suspect's performance of filed [sic] sobriety tests and signs of intoxication in the attached SFST SCORING SHEET, which is attached hereto and incorporated herein for all purposes.

8. Additional facts leading me to believe that the suspect was intoxicated while operating a motor vehicle in a public place are as follows:

   Involved in motorcycle crash (case #1402159).  Passenger DOA + suspect is in coma at Spohn Memorial Hospital.

***Also See Attached Probable Cause Statement, Which Is Attached Hereto And Incorporated Herein For All Purposes.***

9. I have seen intoxicated persons on many occasions in the past. Based on all of the above and my experience and training, I determined that the suspect was intoxicated, and I placed the suspect under arrest for Driving While Intoxicated.  I requested a sample of the suspect's breath and/or blood, which the suspect refused to provide.

Upon review of Officer Harrison's affidavit, the magistrate signed the warrant at 1:19 a.m.

Before the introduction of the blood evidence, Hyland moved to exclude the results of the blood draw, alleging that paragraphs six, seven, and nine all contained reckless or deliberate falsehoods that rendered the affidavit defective.   The trial court held a *Franks* hearing to determine the truth or falsity of the contested statements.[2]   *See Franks v. Delaware*, 438 U.S. 154, 156 (1978).

---

[2] The affidavit refers to an "attached probable cause statement."   In that statement, Officer Harrison more fully set out the details of his investigation, his acquisition of the search warrant, and his observation of the blood draw at 2:04 a.m.   Based on its content, it is apparent that Officer Harrison drafted

4

As to paragraph six of the affidavit, Hyland argued that Officer Harrison never actually smelled the "strong" odor of alcohol on his breath. Officer Harrison testified at the *Franks* hearing that when he arrived at the scene of the motorcycle accident, Hyland was already being loaded into the ambulance. Harrison agreed that he did not mention that he smelled alcohol on Hyland in his investigative report; instead, Officer Harrison's report only mentioned that a paramedic told him that Hyland smelled of alcohol.

However, Officer Harrison testified that he had in fact smelled alcohol on Hyland's breath. According to Officer Harrison, he followed the ambulance to the hospital, where he saw Hyland unconscious in a hospital bed. He approached within one or two feet of Hyland's face and smelled a strong odor of alcohol. He then read a statutory warning and drew up his affidavit. Based on Officer Harrison's testimony, the trial court denied Hyland's challenge to paragraph six.

Hyland next asserted that Officer Harrison never asked him to perform field sobriety tests, as alleged in paragraph seven, and never requested a sample of Hyland's "breath and/or blood, which the suspect refused to provide," as alleged in paragraph nine. Hyland pointed out that he was in a coma when Officer Harrison approached him.

Officer Harrison agreed. He testified that paragraphs seven and nine were preprinted in the affidavit form, and though he knew the content of the affidavit, it did not occur to him to cross out inapplicable paragraphs. Officer Harrison testified that in the

this statement at some time after the issuance of the warrant at 1:19 a.m., and this statement could not have been presented to the magistrate in pursuing the warrant. When this timing problem was presented to the trial court, the court made clear that its ruling on the *Franks* motion was based solely on Officer Harrison's affidavit itself and not on his later-drafted statement. Accordingly, we do not consider this statement in determining whether the warrant had a valid basis in probable cause.

hundreds of blood warrants he had handled in the past, crossing out this stock language had never been an issue, and he did not intend to mislead the magistrate by leaving this preprinted content in his affidavit. Instead, as the State pointed out, Officer Harrison made a handwritten notation in paragraph eight that "suspect is in coma at Spohn Memorial Hospital."

Based on Officer Harrison's testimony, the trial court sustained Hyland's *Franks* motion and excised the entirety of paragraph seven from the affidavit, concerning Hyland's performance on field sobriety tests. The trial court also excised the final sentence of paragraph nine, which concerned Hyland's refusal to provide a breath or blood sample.

However, the trial court found that even after excluding those statements, the redacted affidavit nonetheless stated a sufficient basis of probable cause to believe that a search of Hyland's veins would yield evidence of a crime. The trial court overruled Hyland's motion to suppress the blood evidence.

## B. Applicable Law

Ordinarily, the constitutional preference for searches based upon warrants requires reviewing courts to give "great deference" to a magistrate's determination of probable cause. *State v. Le*, 463 S.W.3d 872, 876 (Tex. Crim. App. 2015). But that deference is not called for when a *Franks* motion is sustained. *Id.* at 877. Under *Franks v. Delaware*, if the defendant satisfies the court by a preponderance of the evidence that a false statement was included in the warrant affidavit intentionally or with reckless disregard for the truth, the affidavit's false material must be set to one side. 438 U.S. at

6

156. If, after excising the tainted material, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. *Id.*

Where a *Franks* motion has been sustained, we afford no deference to the magistrate's decision to issue a warrant, in part because a "magistrate's judgment would have been based on facts that are no longer on the table," and there is "no way of telling the extent to which the excised portion influenced the magistrate judge's determination." *Le*, 463 S.W.3d at 877. More importantly, it reinforces the principle that "[a] search warrant may not be procured lawfully by the use of illegally obtained information." *Id.*

In such situations, the question becomes whether, putting aside all tainted allegations, the independently acquired and lawful information stated in the affidavit nevertheless "clearly" established probable cause. *McClintock v. State*, 444 S.W.3d 15, 19 (Tex. Crim. App. 2014) (quoting *Castillo v. State*, 818 S.W.2d 803, 805 (Tex. Crim. App. 1991) (en banc)). A search warrant based in part on tainted information is nonetheless valid if it clearly could have been issued on the basis of the untainted information in the affidavit. *Le*, 463 S.W.3d at 877.

We read the purged affidavit in a commonsense manner, drawing reasonable inferences from the information to determine whether probable cause is established. *Id.*; *see Illinois v. Gates*, 462 U.S. 213, 231 (1983). Probable cause exists if, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at a specified location. *State v. McLain*, 337 S.W.3d 268, 272 (Tex.

7

Crim. App. 2011). Probable cause is a "flexible and nondemanding" standard, though one that cannot be satisfied by "mere conclusory statements of an affiant's belief." *Rodriguez v. State*, 232 S.W.3d 55, 60–61 (Tex. Crim. App. 2007). Rather, within its four corners, the warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. *Franks*, 438 U.S. at 165; *see Massey*, 933 S.W.2d at 148.

## C.    Analysis

The trial court sustained Hyland's *Franks* motion in part and excised certain statements from the affidavit. To justify excision under *Franks*, the false statement in the affidavit must have been either intentional or made with reckless disregard for the truth, and a misstatement that is merely the result of simple negligence or inadvertence will not render invalid the warrant based on it. *Hinojosa v. State*, 4 S.W.3d 240, 247 (Tex. Crim. App. 1999) (citing *Franks*, 438 U.S. at 170); *Dancy v. State*, 728 S.W.2d 772, 782–83 (Tex. Crim. App. 1987) (en banc). However, neither party has challenged the trial court's implied finding[3] that Officer Harrison acted with reckless disregard for the truth in failing to cross out material from the preprinted form. Moreover, as the sole fact-finder and judge of the witnesses' credibility and weight of the evidence at a *Franks* hearing, the trial court is owed great deference, and its ruling will be overruled only if it is outside the

---

[3] When the trial court does not make explicit findings of fact, we should assume that the trial court made implicit findings that support its ruling, so long as those implied findings are supported by the record. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *see also Laird v. State*, No. 06-17-00105-CR, 2017 WL 4896518, at *3 (Tex. App.—Texarkana Oct. 31, 2017, no pet.) (mem. op., not designated for publication) (applying this principle to a court's ruling on a *Franks* challenge of a DWI arrest).

bounds of reasonable disagreement. *Hinojosa*, 4 S.W.3d at 247. We are therefore bound by this finding.

The trial court found that the redacted affidavit nonetheless stated probable cause to believe that a blood draw would yield evidence that Hyland was driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04(a) (West, Westlaw through 2017 1st C.S.). Hyland argues that when the falsehoods are excised, the remainder of the affidavit is insufficient to clearly establish probable cause to believe that he was intoxicated.

The purged affidavit states only two particular facts related to intoxication: Hyland was in a coma after a collision that killed his passenger, and Officer Harrison perceived a "strong" odor of alcohol from Hyland.

The State asserts that these two facts are sufficient to clearly establish probable cause to justify the issuance of a search warrant, citing several cases in which courts have found probable cause to justify a *warrantless arrest* based on little more than the smell of alcohol and a severe or recklessly caused collision. *See Pesina v. State*, 676 S.W.2d 122, 123 (Tex. Crim. App. 1984) (en banc) (finding probable cause to arrest based on a collision where appellant was driving the wrong way on a highway, gave off a "strong odor of alcohol," and was observed in the hospital "muttering and stuttering" incoherently hours after the accident); *State v. May*, 242 S.W.3d 61, 62 (Tex. App.—San Antonio 2007, no pet.) (mem. op.) (finding probable cause to arrest based on officers' observation of appellant recklessly causing a collision, a "moderate odor of intoxicants," and other minor supporting facts); *Mitchell v. State*, 821 S.W.2d 420, 424–25 (Tex. App.—Austin 1991,

9

pet. ref'd) (per curiam) (finding probable cause to arrest based on (1) testimony that appellant had a "strong odor of alcoholic beverage," (2) a severe collision leaving a passenger near death, and (3) appellant's averting his eyes when asked for a blood sample).

In some ways, these cases lend support to the State's argument. In *May*, for example, the court of appeals found probable cause to arrest based on testimony that multiple officers "heard the screeching of tires and then observed May's vehicle leave the roadway, travel on the sidewalk, and then strike another motorist," and May "had a moderate odor of intoxicants on her breath." 242 S.W.3d at 61–62. This was so, even though the trial court indicated in its findings that it disbelieved the officers' testimony concerning May's failure of a field sobriety test, which is somewhat similar to the trial court's ruling on field sobriety testing in this case. *See id.* at 62.

However, these cases dealt with warrantless arrests, and none dealt with a situation in which the trial court has sustained a *Franks* motion and purged false statements from a warrant affidavit, triggering the requirement that the independently acquired and lawful information stated in the affidavit must "clearly" establish probable cause. *See McClintock*, 444 S.W.3d at 19 & n.17 (quoting Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.4(c), at 696 & n.73 (5th ed. 2012)) ("When a court reassesses a search warrant affidavit with the allegations found to be false . . . excised, a doubtful or marginal case for probable cause should be resolved in the defendant's favor." (Editorial marks omitted)). These warrantless arrest cases offer limited assistance.

10

In other ways, this case is similar to *McClintock*, where evidence was obtained through a warrant found to contain illegal information. *See id.* at 18. The *McClintock* court found that once the tainted allegations were excised, the only particular facts that remained in the affidavit were: the affiant officer smelled the odor of marijuana from outside a business location, which was described in ambiguous terms; an uncorroborated tip that marijuana was being grown inside; and appellant's pattern of coming and going from the location "well before and after" business hours. *See id.* at 16–19. In light of the fact that part of the warrant had already been tainted by a Fourth Amendment violation, the court held these facts insufficient to "*clearly* establish[] probable cause." *See id.* at 19–20 (emphasis in original). Here, like *McClintock*, critical parts of the affidavit have been excised due to an illegality, and the redacted affidavit's theory of probable cause rests solely on smell and circumstance: the vaguely-described smell of alcohol and the circumstance of a fatal collision. *See id.*; *see also State v. Davis*, No. 05-15-00232-CR, 2016 WL 60574, at *5–7 (Tex. App.—Dallas Jan. 5, 2016) (op., not designated for publication) (similar), *judgm't vacated on other grounds*, No. PD-0111-16, 2017 WL 4401879 (Tex. Crim. App. Oct. 4, 2017).

In still other ways, this case resembles *State v. Lollar*. No. 11-10-00158-CR, 2012 WL 3264428, at *2 (Tex. App.—Eastland Aug. 9, 2012, no pet.) (mem. op., not designated for publication). There, a DWI defendant challenged an officer's use of a form affidavit to secure a warrant, asserting that certain paragraphs did not apply to her. *Id.* In particular, the defendant challenged paragraph seven, which, like paragraph seven of the affidavit in this case, described the officer's performance of field sobriety testing on the

11

defendant. *Id.* During the hearing, the affiant officer conceded that paragraph seven was false, and the trial court discovered an additional inaccuracy:

> Officer Watkins said, in paragraph nine of the search warrant affidavit, that she requested a sample of Appellee's breath and/or blood and that Appellee refused. At the hearing, Officer Watkins admitted that she never asked Appellee for a sample of breath or blood.

*Id.* Thus, the affidavit in *Lollar* suffered from the same errors as the affidavit in this case: false information concerning field sobriety testing and requests for a breath or blood sample. The *Lollar* court rejected the notion that the affiant officer need not "mark out" the preprinted material that did not apply. *Id.* at *4. "Form affidavits can be a valuable tool for law enforcement when time is of the essence; if abused, they also have the potential to infringe on Fourth Amendment rights." *Id.* Here, as in *Lollar*, we are bound by the trial court's finding that these falsehoods were made in reckless disregard for the truth. *See Hinojosa*, 4 S.W.3d at 247. That being the case, we are compelled to agree that the "affiant must bear responsibility for the contents of a sworn affidavit presented to a magistrate for signature." *See Lollar*, 2012 WL 3264428, at *4.

In *Lollar*, the deliberate or reckless discrepancies in the affidavit—along with the affiant-officer's demeanor—led the trial court to grant the defendant's *Franks* motion. *Id.* at *2. As in this case, the resulting excision left nothing more in the warrant affidavit than the fact of a collision and the odor of alcohol to support probable cause. *Id.* The trial court granted suppression. *Id.*

Reading the affidavit with the false statements excised, and following the guidance of *McClintock* and *Lollar*, we must conclude that the affidavit does not "clearly" establish probable cause. *See McClintock*, 444 S.W.3d at 19; *see also Lollar*, 2012 WL 3264428,

12

at *4. Because the affidavit's remaining content is insufficient to clearly establish probable cause, the search warrant must be voided and the fruits of the search excluded. *See Franks*, 438 U.S. at 156.

## II.    CONSTITUTIONAL HARM

Having found error in the denial of Hyland's motion to suppress, we next conduct a harm analysis to determine whether the error calls for reversal of the judgment. *See* TEX. R. APP. P. 44.2.

### A.    Standard of Review and Applicable Law

The erroneous admission of evidence obtained in violation of the Fourth Amendment is assessed under Rule 44.2(a)'s constitutional standard. *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Under Rule 44.2(a), we reverse the judgment unless we can conclude beyond a reasonable doubt that the constitutional error did not contribute to the defendant's conviction or punishment. TEX. R. APP. P. 44.2(a); *Snowden v. State*, 353 S.W.3d 815, 818 (Tex. Crim. App. 2011). In applying this test, we ask whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Love v. State*, __S.W.3d__, __, No. AP-77,024, 2016 WL 7131259, at *7 (Tex. Crim. App. Dec. 7, 2016); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc).

Our analysis should not focus on the propriety of the trial's outcome; instead, we calculate the error's probable impact on the jury in light of all other evidence available. *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007). We take into account any and every circumstance apparent in the record that logically informs an appellate

13

determination of whether the error contributed to the conviction or punishment. *Snowden*, 353 S.W.3d at 822. This requires us to evaluate the entire record in a neutral manner and not in the light most favorable to the prosecution. *Love*, __S.W.3d at __, 2016 WL 7131259, at *7; *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (en banc).

In our review, we may consider factors including the nature of the error, whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations. *Snowden*, 353 S.W.3d at 822.

## B.    Analysis

The "nature of the error" was the erroneous admission of Hyland's blood draw and other evidence that was constitutionally tainted by it. *See id.*; *Turner v. State*, 734 S.W.2d 186, 188 (Tex. App.—Dallas 1987, pet. ref'd). The jury heard that the blood draw was conducted under authority of a lawful search warrant obtained by Officer Harrison. The blood draw was taken at 2:04 a.m. on the night of the accident by Norma Zamora, the phlebotomist at the hospital where Hyland was treated. James Evans, a forensic scientist with the DPS lab, testified concerning his analysis of the blood sample that Zamora purportedly drew from Hyland pursuant to the warrant. After Evans discussed his qualifications and method of analysis, he discussed Hyland's blood alcohol content ("BAC"), and the blood sample was admitted over objection. Evans testified that his analysis returned a BAC of .175 grams of alcohol per deciliter of blood (g/dL), which he testified was over twice the legal limit of .08 g/dL. Evans testified that for a 6'1" male

14

weighing 185 pounds[4] to reach that level of intoxication, that person would need to consume six standard-size alcoholic drinks in an hour, or ten alcoholic drinks over the space of three hours. If believed by the jury, the sole strength of this evidence might have led the jury to find the element of intoxication. *Compare Turner*, 734 S.W.2d at 188 (finding constitutional harm and noting that an inadmissible blood test directly led the jury to find intoxication, as shown by correspondence during deliberations) *with Campbell v. State*, 325 S.W.3d 223, 239 (Tex. App.—Fort Worth 2010, no pet.) (finding no constitutional harm in a DWI case where the nature of the error was exposing the jury to an only somewhat inculpatory remark by the defendant). In our view, the "nature of the error" and its "probable implications" both favor the conclusion that it was not harmless beyond a reasonable doubt. *See Snowden*, 353 S.W.3d at 822.

The blood test was also "emphasized by the State," *see id.*, during closing argument as its most potent evidence of intoxication:

> [Hyland and Doherty] left the Frontier Saloon on Leopard Street. You heard testimony regarding intoxication. They were both intoxicated. . . . Doherty was intoxicated, Richard Hyland was intoxicated. Her blood alcohol was higher than his; his was a .175. That's twice the legal limit. And so the State can prove intoxication to you all in three ways: Either through the normal use of your mental faculties, normal use of your physical faculties, or having a blood alcohol content above a .08. And it's undisputed. It's in evidence that his blood alcohol content was a .175. The DPS, Mr. Evans, forensic toxicologist, retested the blood and—excuse me—tested the blood, and it was a .175. That's intoxication. When you get to that point, you're twice the legal limit, you're very intoxicated.

The State then moved away from the element of intoxication and on to other aspects of the case, such as the identity of the driver of the motorcycle.

---

[4] At another point during trial, Hyland's measurements were presented to the jury in loosely similar terms as 6'0" and 170 pounds.

Aside from the results of the DPS blood test, the other evidence concerning intoxication was not overwhelming, suggesting that an average jury would likely have assigned great weight to the results of the blood draw. *See id.* at 819 & 822; *Rubio*, 241 S.W.3d at 3. Officer Harrison testified that he approached Hyland's hospital bed, stood within one or two feet of Hyland's face, and smelled a "strong odor of alcohol." Dr. Adel Shaker, a medical examiner, primarily testified concerning his autopsy of Doherty. However, Dr. Shaker also testified, briefly and over objection, that Hyland's medical records showed his BAC was "over the legal limit."[5] Officer David Schwartz, an accident reconstruction expert, stated his conclusion that the cause of the accident was the driver "operating at a high rate of speed under the influence of alcohol." Lastly, the jury also heard evidence concerning reckless handling of the motorcycle and the severity of the collision; three witnesses observed a man matching Hyland's description driving erratically and at great speed on the evening of the accident, and moments later, the witnesses came upon the nearby scene of the accident and found Hyland injured and Doherty lifeless on the ground, as further discussed *infra*.

This alternative evidence of intoxication certainly would have shaped a jury's view of the case. *See Rubio*, 241 S.W.3d at 3. But because this other evidence was not overwhelming, and in light of the great probative force of the blood test and its emphasis by the State, this other evidence does not eliminate the "reasonable possibility" that the

---

[5] While not explained before the jury, Dr. Shaker was apparently referring to a separate blood analysis that appeared in Hyland's medical records from the hospital, which was unrelated to the DPS blood test. The medical records themselves were not introduced in evidence, the appellate record offers no further information concerning this second test—such as who collected the sample or who analyzed it— and the parties do not discuss it in their appellate briefs.

16

error contributed to Hyland's conviction.   *See Love*, __S.W.3d at __, 2016 WL 7131259, at *7; *Snowden*, 353 S.W.3d at 822; *cf. Cone v. State*, 383 S.W.3d 627, 638–39 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (finding an erroneously admitted blood test harmless in light of "extensive evidence" of intoxication, including defendant's consumption of sixteen drinks, his reckless driving, his extremely intoxicated and incoherent demeanor which required responders to restrain him twice, among other things).

After reviewing the entire record, we cannot conclude beyond a reasonable doubt that the constitutional error did not contribute to Hyland's conviction.   TEX. R. APP. P. 44.2(a); *Snowden*, 353 S.W.3d at 818.   This harmful constitutional error requires reversal of the judgment.   *See* TEX. R. APP. P. 44.2(a).   We sustain Hyland's third issue.

### III.   SUFFICIENCY OF THE EVIDENCE

It remains necessary to address Hyland's sufficiency challenge, which could afford him the greater relief of acquittal.   *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).   By his second issue, Hyland challenges the sufficiency of the evidence to support his conviction for intoxication manslaughter.[6]   A person commits the offense of intoxication manslaughter if the person operates a motor vehicle in a public place while intoxicated, and by reason of that intoxication, the person causes the death of another by accident or mistake.   TEX. PENAL CODE ANN. § 49.08(a) (West, Westlaw through 2017 1st

---

[6] For ease of reference, we have discussed Hyland's issue concerning blood evidence out of turn. Hyland has demonstrated a harmful constitutional error, and he is entitled to a new trial.   This renders it unnecessary to consider Hyland's fourth issue, in which he presents another challenge to the blood evidence.   *See State v. Plambeck*, 182 S.W.3d 365, 367 n.10 (Tex. Crim. App. 2005) (en banc) ("A court is not required to address issues that become moot because of the resolution of other issues . . . ."); *see also* TEX. R. APP. P. 47.1.

17

C.S.). Hyland asserts that the evidence is legally insufficient to show that he operated a motorcycle or that his intoxication caused Doherty's death.

## A.     Background

On the evening of May 30, 2014, Doherty was killed in a motorcycle accident in Corpus Christi, Texas. Three witnesses testified that they observed different portions of the events leading to the accident: Juan Ledesma, Phyllis Ledesma, and Roger Villarreal.

Juan Ledesma testified that around 10:50 p.m., he was driving eastbound with his wife Phyllis when a motorcyclist emerged from the parking lot of the Frontier Saloon. According to Juan, the motorcyclist went "shooting across the road" and cut him off. Juan jammed his brakes to avoid hitting the motorcycle, and the driver of motorcycle swerved into the westbound lane to avoid Ledesma's vehicle. The motorcyclist then veered back into the eastbound lane. Juan saw that the driver of the motorcycle was male, and his passenger was a woman with long blonde hair flowing from under her helmet. Ahead was an intersection where cars were stopped at a red light, and the motorcyclist was forced to hit the brakes and swerve to one side of a vehicle to avoid a collision. Juan testified that the motorcyclist then "popped the clutch on the motorcycle," jolting the bike forward, and his female passenger nearly fell off the back. Both Juan and Phyllis Ledesma testified that the motorcyclist was driving erratically, weaving in and out of traffic and varying his speed; at some points, it looked to Phyllis as though the motorcycle was going to lean and "tump[] over."

18

According to Juan, the motorcyclist then made a U-turn and began heading westbound. Juan took a U-turn as well. He saw the motorcyclist accelerate to a great speed. Juan could not keep pace, and he soon lost sight of the motorcycle.

Juan continued down the road until, roughly five minutes later, he came upon the scene of an accident: at a curve in the road, he saw two people on the ground, as well as the same motorcycle he had observed earlier. Juan recognized one person as the man driving the motorcycle, who was gasping for air. The other was a blonde woman with a lifeless expression. Neither one was wearing a helmet. Juan administered CPR to the woman until paramedics arrived. Juan later identified the two people as Hyland and his wife Doherty, who was also identified at trial by her mother.

Similar to Juan's testimony, Roger Villarreal attested that he was driving with his wife when he observed a motorcycle traveling at great speed, weaving in and out of traffic. He took note of the motorcycle's driver, whom he described as a larger male, as well as a smaller-bodied passenger, whom he believed to be a woman. Villarreal testified that he briefly lost sight of the motorcycle, but he soon came upon the scene of the accident, where he saw a man and a woman with the same stature as those riding the motorcycle "seconds" earlier. He joined Juan Ledesma in trying to revive Doherty.

Ray Cordova, a paramedic, responded to the accident. Cordova testified that when he arrived, he found Hyland breathing in a labored manner, and found Doherty pulseless and not breathing. Cordova arranged for a second medic team to confirm her status while he took Hyland to the hospital. Doherty was pronounced dead at the scene.

Officer Harrison's testimony at trial was similar to his testimony at the *Franks* hearing; he discussed his arrival at the scene, his trip to the hospital—whereupon he smelled alcohol on Hyland's breath—and his creation of the warrant affidavit. The jury then heard other evidence of intoxication which we have previously discussed, including the DPS blood test result of .175 g/dL and Dr. Shaker's conclusion that Hyland's BAC was "over the legal limit."

Dr. Shaker testified concerning his autopsy of Doherty. He classified Doherty's death as accidental, and he attributed the cause of death to blunt force trauma, which fractured Doherty's neck and skull. At the time of her death, Doherty had a BAC of .183 g/dL and Xanax in her system.

Officer Schwartz testified that he investigated the crash site and attempted to map out the course of the motorcycle after its driver began to lose control. Officer Schwartz documented a trail of evidence, including debris from the motorcycle, pieces of clothing, a helmet, and various marks on the ground that indicated the motorcycle's path, such as a curb smeared with blood and blonde hairs. The trail began near a curved portion of Leopard Street, at a curb with tire marks on it, and ended where the motorcycle came to rest. He explained that after the motorcycle hit the curb, it skidded and then tumbled 289 feet—"almost a football field." Officer Schwartz opined that the length of the trail and the nature of the skid and gouge marks were consistent with a motorcycle traveling above forty-five miles per hour, the speed limit for that stretch of road.

As to the identity of the driver, Officer Schwartz further testified that in his years as an accident reconstructionist, he had never investigated a collision where a female was

20

driving a motorcycle and a male was riding as her passenger—a possibility that he viewed as unlikely in light of prevailing social conventions. He agreed that Doherty was found without a helmet, but nonetheless believed that she was the helmet-wearing passenger that Juan Ledesma had described. Officer Schwartz theorized that the helmet had been thrown off Doherty during the collision. Ultimately, Officer Schwartz opined that the cause of the accident was the driver "operating at a high rate of speed under the influence of alcohol."

Hyland's sole witness was Orin Moore, a court-appointed accident reconstruction expert and retired captain with DPS. Moore testified concerning what he viewed as deficiencies in Officer Schwartz's reconstruction of the accident, such as a failure to collect evidence concerning certain aspects of the case and a failure to provide context to the evidence that was collected.

In Moore's opinion, the investigation did not yield enough information to justify Officer Schwartz's conclusions. According to Moore, nothing that was uncovered during the investigation suggested that Hyland was intoxicated, and there was nothing to indicate why the motorcycle left the road after having successfully negotiated a curve and entered a straightaway.

Moore testified that even assuming Hyland was driving, Doherty's intoxication could have posed a problem for the driver of the motorcycle. However, Moore believed that there was not enough information to conclude that Hyland was driving the motorcycle. Instead, Moore testified that a driver of a motorcycle will usually be found closer to the motorcycle than their passenger, due to the driver's ability to grip the handlebars. During

21

his closing, counsel for Hyland argued that Doherty was found closer to the motorcycle than Hyland, suggesting that Doherty was driving.

After the conclusion of the evidence, the jury found Hyland guilty of intoxication manslaughter, enhanced by prior convictions and a deadly weapon finding, and sentenced Hyland to twenty-seven years' confinement.

## B.    Applicable Law

When conducting a legal sufficiency review, this Court considers all evidence in the record of the trial, whether it was admissible or inadmissible.  *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013).  Thus, regardless of whether the blood evidence was properly admitted, it is considered in a review of the sufficiency of the evidence.  *See id.*

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt.  *Id.* at 768.  We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony.  *Id.*  It is not necessary that every fact point directly and independently to the guilt of the accused; it is enough if the finding of guilt is warranted by the cumulative force of all the incriminating evidence.  *Id.*  Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.  *Hooper v. State*, 214 S.W.3d 9, 13

22

(Tex. Crim. App. 2007).   Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence.   *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

## C.    Analysis

Hyland first challenges the finding that he operated the motorcycle.   *See* TEX. PENAL CODE ANN. § 49.08(a).   Hyland contends that none of the evidence at trial established his identity as the driver of the motorcycle, especially as opposed to Doherty. We disagree.

Juan Ledesma testified that he observed a man driving a motorcycle erratically with a blonde passenger; when the motorcyclist reversed course, Juan followed; minutes later Juan happened upon the scene of the accident, where a man and a blonde woman lay injured near the "same" motorcycle.   *See Conelly v. State*, 451 S.W.3d 471, 475 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (finding sufficient evidence of operation based on witness's consistent identification of the same erratically driven red SUV).   Juan identified the injured man in two ways:   (1) as the driver of the motorcycle and (2) as Hyland.   The jury could confidently infer that Juan had identified Hyland as the driver of the motorcycle.   *See Phillips v. State*, 534 S.W.3d 644, 651 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (finding sufficient evidence based in part on a witness's distinct identification of driver, as opposed to passenger who allegedly switched places with him in the lead up to a collision, even though witness briefly lost sight of the vehicle in the dark and "arrived at the scene immediately after").

23

Similarly, Villarreal testified that he observed a larger man driving a motorcycle with a smaller, female passenger, and "seconds" later he came upon an accident involving two people with the same proportions: Hyland and Doherty. *See Hines v. State*, 383 S.W.3d 615, 623 (Tex. App.—San Antonio 2012, pet. ref'd) (finding sufficient evidence of identity based in part on witness who saw, in the vehicle's driver seat, a man "around the same height" as DWI appellant).

Hyland disputes this evidence, relying on Moore's theory that following a collision, the driver of a motorcycle will usually be found closer to the motorcycle than a passenger. According to Hyland, Officer Schwartz's testimony shows that Doherty was found nearer to the motorcycle than he. However, Officer Schwartz never testified that Hyland was found closer to the motorcycle. Instead, Officer Schwartz disputed Moore's theory, asserting that there is no universal rule for driver positioning. Even assuming Moore's theory to be true in all cases, the sole support for Hyland's argument was photographs of the scene in which Hyland was not pictured, having been taken to the hospital by paramedics. Rather, two paramedics—Ray Cordova and James Denton—testified that when they arrived, they found Hyland nearer to the motorcycle than Doherty. *See Gunter v. State*, 327 S.W.3d 797, 800–01 (Tex. App.—Fort Worth 2010, no pet.) (concluding that evidence showed appellant was operator of a motorcycle, despite conflicting circumstantial evidence of another possible operator); *see also Maynard v. State*, No. 06-03-00029-CR, 2003 WL 22956994, at *4 (Tex. App.—Texarkana Dec. 17, 2003, pet. ref'd) (op., not designated for publication) (finding sufficient evidence that

24

appellant, and not victim, was driving vehicle, where body positioning suggested that the deceased victim was the passenger).

Finally, Hyland complains that Officer Schwartz improperly relied on gender stereotypes to conclude that Doherty was not driving the motorcycle. Hyland does not cite any rule prohibiting an expert from testifying about social conventions.[7] Regardless, Officer Schwartz did not base his testimony solely on his notion of gender roles, but on his thirty years of personal experience as a peace officer, ten of which he had spent specifically investigating traffic fatalities. He testified that in that time, he had never encountered a collision involving a motorcycle driven by a female with a male as the passenger, which the jury was entitled to consider, whatever its probative value. *See Hooper*, 214 S.W.3d at 13; *see also Gasper v. State*, No. 01-16-00930-CR, 2017 WL 4249558, at *2 (Tex. App.—Houston [1st Dist.] Sept. 26, 2017, no pet.) (mem. op., not designated for publication) (weighing, within a sufficiency review, an officer's testimony that in his experience on a police task force for internet crime, he had "never seen a situation where a person had accidentally downloaded child pornography" (internal quotations and editorial marks omitted)).

Taken together and viewed in the light most favorable to the prosecution, this evidence would allow a reasonable trier of fact to find beyond a reasonable doubt that Hyland operated the motorcycle. *See Winfrey*, 393 S.W.3d at 768.

---

[7] *Cf. Huff v. State*, 467 S.W.3d 11, 19–20 (Tex. App.—San Antonio 2015, pet. ref'd) (finding sufficient evidence of appellant's identity as operator of a motorcycle in an intoxication manslaughter prosecution, despite testimony that his female victim often drove the motorcycle with appellant as a passenger, which appellant's friend thought was "weird").

Hyland next challenges the sufficiency of the evidence to show that Doherty's death was caused by reason of his intoxication. *See* TEX. PENAL CODE ANN. § 49.08(a). He asserts that there is nothing in the record to indicate that his intoxication caused the accident, and instead, Doherty's unsteadiness as a passenger was the more likely cause.

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. *Id.* § 6.04(a) (West, Westlaw through 2017 1st C.S.). This requirement is satisfied when either (1) the accused's conduct is sufficient by itself to have caused the harm; or (2) the accused's conduct coupled with another cause is sufficient to have caused the harm. *Matamoros v. State*, 500 S.W.3d 58, 64 (Tex. App.—Corpus Christi 2016, no pet.). "Whether such a causal connection exists is normally a question for the jury's determination." *Id.* at 64–65. The State was required to prove that Hyland's intoxication caused the fatal result, and not just his operation of a vehicle. *Id.* at 65.

Hyland asserts that there was nothing to indicate that his intoxication caused the accident. Instead, relying on Moore's testimony, he insists that Doherty's "heavily intoxicated state" (.183 g/dL BAC combined with Xanax) and her resulting unsteadiness was likely the cause of the collision. However, there was no evidence that Doherty's intoxication or actions actually caused the collision.

By contrast, there was evidence that Hyland had a similar BAC to Doherty (.175 g/dL) when it was measured, two hours after the accident. Given that Hyland was driving the motorcycle, the jury could have inferred that Hyland's intoxication was far more likely

26

to have caused the accident. This inference is also supported by testimony concerning Hyland's reckless driving, beginning with Juan Ledesma's observation of a motorcycle shooting out of the parking lot of the Frontier Saloon, swerving to avoid two near-misses, and accelerating so rapidly that Doherty nearly fell off. After Juan lost sight of Hyland, Villarreal observed similar driving, and he met the Ledesmas at the scene of the accident seconds later. Officer Schwartz explained that, based on the evidence at the scene, he believed that Hyland's intoxication caused him to hit a curb while attempting to negotiate a curve at a high speed, sending the motorcycle into a skid and then a tumble that stretched 289 feet, to the spot where Doherty was found.

Considering all of this evidence in the light most favorable to the verdict, a rational fact-finder could have found the element of but-for causation beyond a reasonable doubt. *Winfrey*, 393 S.W.3d at 768; *see also Hale v. State*, 194 S.W.3d 39, 40 & 44 (Tex. App.— Texarkana 2006, no pet.) (finding sufficient evidence of causation in testimony that appellant was "flying" down the road with a BAC of .147 g/dL, and victim's conduct— stopping briefly—was not clearly sufficient to cause accident); *Serrano v. State*, No. 14- 05-00646-CR, 2007 WL 324606, at *2 (Tex. App.—Houston [14th Dist.] Feb. 6, 2007, no pet.) (mem. op., not designated for publication) (finding sufficient evidence of causation based on a single-car collision where appellant driver skidded off the road and killed his passenger, drank in the car, had a BAC of .12 g/dL, and was speeding, and there was no evidence of any obstacles in the road).

Having found the evidence sufficient to support the only elements challenged by Hyland, we overrule Hyland's second issue.[8]

## IV.   CONCLUSION

Having found a harmful constitutional error, we reverse the judgment of conviction and remand the matter to the trial court for further proceedings consistent with this opinion.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
5th day of April, 2018.

---

[8] This renders it unnecessary to consider Hyland's first issue challenging the jury's deadly weapon finding, which could afford him no greater relief than he is already due.  *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *see also Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017) (describing a deadly weapon finding, in this context, as impacting "a convicted felon's eligibility for community supervision, parole, and mandatory supervision").